Donald HILL, Jr., Plaintiff–Appellant,

v.

CITY OF CLEVELAND; Carolyn W. Allen, Director of Public Safety, City of Cleveland; Edward Kovacic, Chief of Police, City of Cleveland; John Whipkey, Patrolman, Badge No. 964; Paul Raynard, Patrolman, Badge No. 1773; and John Doe(s), Members of the Cleveland Police Department, Defendants–Appellees.

No. 92–3259.

United States Court of Appeals, Sixth Circuit.

Argued March 19, 1993.

Decided Dec. 17, 1993.

Robert R. Kracht (argued & briefed), George V. Pilat, McIntyre, Kahn & Kruse, Cleveland, OH, for plaintiff-appellant.

Paul A. Janis (argued & briefed), City of Cleveland Law Dept., Office of Director of Law, Cleveland, OH, for defendants-appellees.

Before MARTIN and SILER, Circuit Judges, and WELLFORD, Senior Circuit Judge.

SILER, Circuit Judge.

Plaintiff Donald Hill, Jr., appeals the entry of summary judgment against him. Hill claims that the release-dismissal agreement between himself and the City of Cleveland ("the City") does not bar his civil rights action against the City and several of its officers. For the following reasons, we affirm the district court.

### Background

This dispute arises from events surrounding Hill's December 20, 1989, arrest by city police officers. During the evening of December 20, 1989, Hill and three others met at Hill's apartment to watch television and socialize. One guest, Campbell, became ill with a headache. When Campbell's headache worsened, another guest phoned Emergency Medical Services ("EMS") to request an ambulance. In order to insure a response, the guest apparently told EMS that Campbell was the victim of an assault.

A few minutes after the ambulance picked up Campbell, a police dispatcher phoned and asked Hill to go downstairs and speak to officers Whipkey and Raynard, who were in front of the apartment building. After finding the officers, Hill agreed to let them see his apartment. Whipkey and Raynard walked with Hill toward the entrance of the apartment building and, as they did so, informed Hill that they were responding to a reported assault. Hill acknowledged this information and told the officers that Campbell had been taken to the hospital.

According to Hill, Whipkey began pushing him as they climbed the stairs to his apartment.[1] Hill claims that he repeatedly objected to the pushing and finally became so upset that he stopped to ask Whipkey and Raynard if they had a search warrant. The City and its officers maintain that Hill appeared to be stalling, swore at the officers, and attempted to block their path up the stairway. The City and its officers further claim that Whipkey and Hill caused an ensuing scuffle when they lost their balance and fell down the stairway. In any event, Hill was arrested. Hill asserts that he asked the officers not to handcuff him, because his disabled left arm was inflexible. Nevertheless, he was handcuffed and his elbow snapped in three places.

Hill was first taken to the police station. His mother, Pearl Hill, telephoned Whipkey at the police station and, upon learning that her son's arm was broken, threatened Whipkey, the department, and the City with legal action. Whipkey, however, stated that he had no contact with Pearl Hill and was not informed of her call before conferring with assistant city prosecutor Louis Bonacci. In any case, Donald Hill was later taken to a hospital. He stayed there for two days and

---

1. Hill was walking slowly, allegedly because of a childhood accident that impaired him mentally and partially paralyzed one side of his body.

was released directly from the hospital without bond.

At 11:52 p.m., on December 20, Whipkey filed an initial report stating that Hill was booked for obstructing official justice, aggravated disorderly conduct, and resisting arrest. The report also noted that Hill was hospitalized for the arm injury. About an hour later, Whipkey conferred with Bonacci. Shortly thereafter, Bonacci prepared formal charges against Hill. No earlier than 8:00 a.m. on December 21, 1989, Pearl Hill filed a complaint with the Police Review Board and told a city prosecutor that she planned to sue the Police Department.

Sometime prior to trial, the city prosecutor, C. Randolph Keller, allegedly approached Hill's attorney, Richard Agopian, about an agreement to dismiss the charges in exchange for a release of Hill's civil claims. Agopian refused and the case went to trial on May 31, 1990. During jury deliberations, it was discovered that a police report had been improperly placed in the jury room. For this reason, the court declared a mistrial.

After the trial, Hill's case was returned to the docket. Hill filed several post-trial motions, which were denied. Hill then filed an appeal. Shortly thereafter, Keller negotiated a release-dismissal agreement with Agopian. Several weeks later, on November 8, 1990, Hill appeared in court and signed the agreement. The agreement was prepared by Agopian and signed by both attorneys and the judge. On December 19, 1990, Hill filed a civil rights complaint in the district court in this case, alleging causes of action against the City and its officers. The district court upheld the validity of the release-dismissal agreement and granted summary judgment in favor of the City.

### Analysis

■ Hill claims the district court erred in granting summary judgment against him. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c);

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In responding to a summary judgment motion, the non-moving party must set "forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Review of a district court's grant of summary judgment is *de novo. Monks v. General Elec. Co.,* 919 F.2d 1189, 1192 (6th Cir.1990).

The propriety of summary judgment turns on the validity of the release-dismissal agreement, in which Hill waived his right to file a civil rights action (42 U.S.C. § 1983) in return for the prosecutor's dismissal of pending criminal charges. Thus, Hill's § 1983 claim stands only if the agreement falls. "The question whether the policies underlying [§ 1983] may in some circumstances render [such an agreement] unenforceable is a question of federal law." *Town of Newton v. Rumery,* 480 U.S. 386, 392, 107 S.Ct. 1187, 1191, 94 L.Ed.2d 405 (1987) (plurality opinion).

The majority in *Rumery* reversed the decision of the court of appeals that there should be a *per se* rule of invalidating release-dismissal agreements in cases of this kind. The plurality in *Rumery* gave the following reasons, among others, why such agreements may be upheld as valid and binding on the parties concerned:

> [T]he court [of appeals] overstated the perceived problems and also failed to credit the significant public interests that such agreements can further.
>
> . . . .
>
> In many cases a defendant's choice to enter into a release-dismissal agreement will reflect a highly rational judgment that the certain benefits of escaping criminal prosecution exceed the speculative benefits of prevailing in an civil action.

*Id.* at 392, 394, 107 S.Ct. at 1191, 1192.

Justice O'Connor reflected the swing vote position of the majority in her separate concurrence:

> I agree with the Court that a case-by-case approach appropriately balances the important interests on both sides of the question of the enforceability of these agree-

ments.... I write separately ... to emphasize that it is the burden of those relying upon such covenants to establish that the agreement is neither involuntary nor the product of an abuse of the criminal process.

*Id.* at 399, 107 S.Ct. at 1195 (O'Connor, J., concurring in part and in the judgment).

■ Based on the foregoing, the City and its officers must establish the enforceability of the release-dismissal agreement because they are asserting the agreement as a defense to Hill's § 1983 claim. *Coughlen v. Coots,* 5 F.3d 970, 973 (6th Cir.1993). To do this, they must show that: (1) the agreement was voluntary, (2) there is no evidence of prosecutorial overreaching, and (3) enforcement of the agreement will not adversely affect relevant public interests. *Coughlen,* 5 F.3d at 974. The following analysis shows that the City and its officers have met their burden and are entitled to summary judgment.

### A. The Voluntariness of the Agreement.

The *Rumery* plurality set forth four factors for determining whether a release-dismissal agreement is voluntary: (1) the sophistication of the criminal defendant; (2) whether the defendant was in custody when he made the agreement; (3) whether the defendant was represented by counsel who drafted the agreement; and (4) whether the defendant had ample time to consider the agreement before signing it. *See Rumery,* 480 U.S. at 394, 107 S.Ct. at 1192 (plurality opinion). Justice O'Connor's concurrence also weighed the criminal defendant's sophistication and the circumstances surrounding execution of the release but listed two additional factors that are relevant to a determination regarding voluntariness: (5) the nature of the criminal charges and (6) whether the agreement was formed under judicial supervision. *Id.* at 401–02, 107 S.Ct. at 1196–97. (O'Connor, J., concurring in part and in the judgment).

■ The release-dismissal agreement in this case was entered voluntarily under the factors listed in *Rumery.* First, although Hill lacked sophistication, unlike the criminal defendant in *Rumery,* his lack of sophistication was offset by the presence of a knowledgeable and experienced defense attorney. Second, like the defendant in *Rumery,* Hill was not in custody when he made the agreement. Third, and again like the defendant in *Rumery,* Hill was represented by counsel capable of advising him as to the best course of action. Hill's counsel also drafted the release-dismissal agreement.

Fourth, Hill had over two months to consider the agreement before signing it; the defendant in *Rumery* had only three days in which to decide. *Id.* at 394, 107 S.Ct. at 1192 (plurality opinion). Fifth, the charges against Hill were relatively minor, thus limiting the coerciveness of the possibility that he would be convicted. In contrast, the defendant in *Rumery* faced a sentence of up to seven years in prison. *Id.* at 402, 107 S.Ct. at 1196 (O'Connor, J., concurring in part and in the judgment). Sixth, Hill's release was executed under the supervision of a state court judge.[2] The defendant in *Rumery* did not enjoy similar treatment. *Id.* at 403, 107 S.Ct. at 1197. In short, there is no reason to doubt that Hill's "choice to enter into a release-dismissal agreement" was a "highly rational judgment that the certain benefits of escaping criminal prosecution exceed[ed] the speculative benefits of prevailing in a civil action." *Id.* at 394, 107 S.Ct. at 1192. (plurality opinion). The City has carried its burden in this regard.

### B. Prosecutorial Overreaching.

■ The *Rumery* plurality recognized that prosecutors may be tempted "to bring frivolous charges, or to dismiss meritorious charges, to protect the interests of other officials." *Id.* at 395, 107 S.Ct. at 1193. The public interest "is disserved when a prosecutor ... brings trumped-up charges to extort a release of civil claims." *Lynch v. City of Alhambra,* 880 F.2d 1122, 1128 n. 9 (9th

---

2. Hill argues that there is an issue as to whether the state court judge "act[ed] in concert with the prosecution in order to effectuate" the release-dismissal agreement. However, the facts Hill cites raise no such issue and do not bear on the voluntariness of the release-dismissal agreement.

Cir.1989).[3] Thus, *Rumery* upheld a release-dismissal agreement where it was voluntarily made and there was "no evidence of prosecutorial overreaching" apart from the agreement itself. *Berry v. Peterson*, 887 F.2d 635, 636, 640 (5th Cir.1989).

Hill supports the allegation of prosecutorial misconduct with the affidavit of his mother, who avers that she telephoned Whipkey and threatened to sue him before he conferred with Bonacci and before Bonacci filed charges, and the December 20 police report, which shows that Hill was hospitalized for the elbow injury before Bonacci filed charges. In short, the affidavits indicate that Bonacci could have, chronologically speaking, discerned the threat of Hill's civil rights action before drafting the charges against Hill. However, Bonacci's affidavit asserts that he did not know of Hill's potential civil rights claim until after the charges were drafted. In the face of Bonacci's unrefuted affidavit, Hill proffers no evidence "suggesting that the circumstances surrounding [the] arrest and threatened prosecution [we]re ... suspicious." *Lynch*, 880 F.2d at 1128. Thus, as in *Rumery*, there is no evidence of prosecutorial overreaching apart from the release-dismissal agreement itself.

The factual situation in this case is significantly different from that related in *Coughlen*, where the plaintiff and the prosecutor executed the release-dismissal agreement without the benefit of judicial supervision. *Coughlen*, 5 F.3d at 972. Here, by contrast, a state judge, who was well-advised of the charges against Hill, authorized the release. Moreover, the state charges withstood motions filed by Hill's attorney before any release was signed, which buttresses the conclusion that there was no prosecutorial overreaching. Again, the City has carried its burden on this issue.

### C. Relevant Public Interests.

"The least well-defined element of a *Rumery* analysis is the consideration of whether enforcement of [a release-dismissal] agreement will 'adversely affect the relevant public interests.'" *Id.* at 975 (quoting *Rumery*, 480 U.S. at 398, 107 S.Ct. at 1194). Nevertheless, enforcement is appropriate on the facts of this case because "police misconduct is alleged, but ... 'the true facts of the case are not known.'" *Id.* at 975 (quoting *Lynch*, 880 F.2d at 1127 n. 8.). The parties' advance conflicting versions of the events leading to Hill's injury, indicating that there is uncertainty as to the "true facts" underlying Hill's civil rights action. Enforcement of the settlement agreement "'allow[s] everyone to declare the case a draw and go home.'" *Id.* Furthermore, the criminal case against Hill went to trial and the jurors were split on whether to acquit him after the mistrial.[4] Thus, doubt exists as to the merits of the criminal charges. This also supports enforcement, given the substantial nexus between the criminal charges and Hill's civil rights action. *Lynch*, 880 F.2d at 1128 n. 8. Finally, enforcement is fitting because the "criminal charges [we]re not the product of prosecutorial misconduct" and enforcement limits the parties' exposure "to potential liabilities and expenses." *Coughlen*, 5 F.3d at 975. While the district court did not discuss the relevant public interests as separate criteria, and such a discussion would have been helpful to us, we have conducted a search of the record with these criteria in mind. For the reasons we have indicated—the failure of the state court to reach a decision on the merits, the conflicting and adversarial positions taken by the parties on the proof, the connection between the civil rights action and the criminal charges, the lack of prosecutorial overreaching, as well as the nature of the charges brought—we are satisfied that the public interest is served here in holding that the agreement between the parties constitutes a bar to the plaintiff's suit.

### Conclusion

Hill voluntarily entered into the release-dismissal agreement with the City. Furthermore, there is no evidence that the release-dismissal agreement resulted from prosecutorial overreaching. Finally, enforcement of

---

3. The existence of prosecutorial misconduct is to be determined by the court, rather than by a jury. *Berry v. Peterson*, 887 F.2d 635, 637 (5th Cir.1989).

4. The jurors voted seven to one to acquit Hill of all charges.

the agreement will not adversely effect relevant public interests. Therefore, the judgment of the district court is AFFIRMED.