**Eleare KINNEY, Plaintiff,**

v.

**CITY OF CLEVELAND,
et al., Defendants.**

**No. 1:99CV3054.**

United States District Court,
N.D. Ohio,
Eastern Division.

May 4, 2001.

Thomas M. Horwitz, Peltz & Birne, Cleveland, OH, for Eleare Kinney, plaintiffs.

Heather D. Graham–Oliver, Awatef Assad, City Of Cleveland, Department Of Law, Cleveland, OH, for Cleveland, City of, Dennis Wondrak, II, City of Cleveland Municipal Court, defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

This action arises out of the arrest of the plaintiff, Eleare Kinney, by Dennis Wondrak, a police officer for the City of Cleveland, on charges of obstructing official business, and out of Kinney's execution of a release-dismissal agreement as a condition for entry into the Cleveland Municipal Court's Standard Intervention Program ("SIP"), under which Kinney agreed to a period of probation in return for dismissal of the criminal charge. Kinney is the sole plaintiff. The defendants are the City, Wondrak, and the Municipal Court. Kinney seeks to recover damages from the City and Wondrak for violations of his civil

rights under 42 U.S.C. § 1983 and for false arrest, assault, battery, defamation, and malicious prosecution.[1] Kinney also seeks an injunction enjoining the City and the Municipal Court from requiring execution of a release-dismissal agreement as a condition for entry into the SIP.

Now before the Court are the defendants' motion for summary judgment and Kinney's cross-motion for partial summary judgment. In this order, the Court rules on the motions only insofar as they address the enforceability of the release-dismissal agreement and the defendants' practice of requiring such agreements as a condition of entry into the SIP. For the following reasons, the Court finds that the agreement executed by Kinney is unenforceable as a matter of law. However, the Court also finds that Kinney is not entitled to injunctive relief against the Municipal Court, and it declines to rule on the issue of injunctive relief against the City until the parties have briefed Kinney's standing and other questions relevant to the issue. Therefore, the defendants' motion (docket no. 23) is granted in part and denied in part, and Kinney's motion (docket no. 21) is granted in part and denied in part. The Court reserves decision on the remaining issues presented by the motions and will decide those issues in a separate order.

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

ty is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this burden, the non-moving party "may not rest upon the mere allegations or denials of [its] pleading;" the burden shifts to the non-moving party to demonstrate the existence of a material dispute. "The non-moving party, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). That is, the non-moving party must go beyond the pleadings and produce some evidentiary support for its position. *Celotex, supra* at 324, 106 S.Ct. 2548.

The Court must view the evidence in the light most favorable to the non-moving party as it determines whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). A fact is material only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court determines whether an issue is genuine by considering the applicable evidentiary standards. Thus in most civil cases, the Court must decide whether the evidence is such that "reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict" or whether, on the other hand, the evidence is "so one-sided that the [moving party] must prevail as a matter of law." *Id.* at 252, 106 S.Ct. 2505. Rule 56(b) "mandates the entry of summary judg-

---

1. As the parties have not briefed the distinction, if any, between Kinney's § 1983 claim and his common law claims with regard to the enforceability of the release-dismissal agreement discussed in this order, this order deals only with Kinney's § 1983 claim. At least thirty days prior to trial, the parties shall brief the issue whether the release-dismissal agreement is enforceable as to the common law tort claims.

ment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, supra* at 322, 106 S.Ct. 2548.

## FACTS [2]

Eleare Kinney is a forty-nine year-old African American man who lives with his wife and two children in Wickliffe. After he graduated from high school he joined the Army, serving as a mechanic in the field artillery. He served in Vietnam for two years with the 100th Airborne Division. Kinney served as a firefighter in Cleveland, rising to the rank of battalion chief before he retired. He is a diabetic.

As a result of saving money diligently for many years, Kinney acquired the capital to purchase several rental properties, including at least one building with commercial space. He owns and operates the B–5 Deli Lounge out of one of his buildings. The Lounge sells packaged foods and has a bar.

The neighborhood surrounding the Lounge has what Kinney describes as a "drug problem," though the problem has gotten better since Kinney has been in touch with Commander McGraff, the police officer in charge of the area, and Joe Jones, his city councilman.

On April 8, 1999, Kinney was at his place of business at approximately 11 p.m., taking stock from his van into the back of his store. At the same time, Wondrak and his partner, John Kubas, were patrolling the neighborhood. They saw a man riding his bicycle erratically on the road without a headlight or signal device. They activat-

ed their dome lights and ordered the man, later identified as Stephen Herring, to stop. Herring, also known as Butch, was a sometime customer in Kinney's store.

Kinney was able to observe the goings on from his shop. He saw the flashing lights of a police car, and he saw the police car pull up approximately one foot from the window of the store. The policemen rushed out of the car and slammed the doors. Kinney said: "What's going on? I didn't call the police. Let's see what's going on?" He stood in the doorway and looked around the corner. Wondrak saw him and said, "Get back in there." Kinney believed the officer was afraid of him. Kinney said, "I'm the owner. I got a right to be here. I got a right to see what's going on in front of my place of business." Wondrak said, "Didn't I say to get back in there?" Kinney said, "Sir, you ain't talking to no kid. I didn't call you. I'm on my property." Wondrak avers that Kinney walked towards him and Kubas; Kinney's testimony was that he merely looked out from his doorway, that he never left his store, and that he probably would have gone back inside on his own had Wondrak not spoken to him. Wondrak began running towards him with his hand on the holster of his gun and said, "You're under arrest," and "You're under fucking arrest." Kinney said, "What's your badge number." He also said, "Sir, why are you arresting me? I didn't swear at you. The only thing I did was identify myself as the owner, and I would appreciate it if you had talked to me with some kind of respect instead of talking to me like I'm a dog." Wondrak then slammed Kinney against the wall twice, almost pulling his shoulder out of its socket. Wondrak used so much force that some of the vinyl siding on the

---

**2.** Because Kinney does not seek summary judgment on his substantive claims, but only on the question of the enforceability of the release-dismissal agreement, the facts surrounding his arrest are recited in the light most favorable to him.

door cracked. Wondrak said, "You're going to the jail tonight."

Kinney then said, "Sir, would it be any help that I'm just a retired battalion chief and I ain't posing no threat? I was just looking to see what was going on." Wondrak said, "Yeah, you didn't get back in the building when I told you to. I could have got killed out there." Wondrak put Kinney into the police cruiser, where he waited for approximately fifteen minutes. During this time, the officers arrested Herring and were determining whether any outstanding warrants for Herring's arrest had been issued. Several of Kinney's customers passed by and saw him in the back of the cruiser. They asked him what had happened, but the officers told them, "You can't talk to him."

The officers determined that a warrant for Herring's arrest was outstanding, and they began driving to the station with Herring and Kinney in the car. Kinney did not want to leave his store unlocked, so he said, "Hey, guys, you all can at least lock up my store. It might get looted like this." He also asked them to loosen his handcuffs, because his hands were numb and he was a diabetic. They refused to loosen the handcuffs. In response to Kinney's request to lock his store, they called their sergeant, who came to the scene. The officers let Kinney out of the car. The sergeant began spitting in his face, and said, "Hey, you may be a chief, but you're going to jail because you could have caused one of these guys to get killed out there. We don't appreciate you doing that." Kinney said, "Sir, I'd appreciate it if you'd stop spitting in my face and pointing in my face." The sergeant said, "Look, you're going to jail tonight. What did you want to do?" Kinney said, "I'd appreciate you letting me lock up my store." The sergeant said, "Okay. We're going to let you lock it up, but you're [sic]

ass is going to jail tonight. If you try anything, things could get really ugly around here. Don't you try nothing." Kinney said, "I'm not a criminal. I haven't did [sic] anything. I don't even know why I'm being arrested." The sergeant said, "You could have got my man killed."

The sergeant then permitted Kinney to call a friend to lock up the store. He was unable to lock it himself, because the officers refused to remove his handcuffs. His friend came and locked up the store. Then he was taken to jail and booked on a charge of obstructing official business. Kinney said, "Hey, can I go get some medical attention?" An officer said, "Oh, what, you trying to sue my office?" Kinney said, "I didn't say anything about that. I just asked you, can I go get some medical treatment for my shoulder?" An ambulance driver arrived about five minutes later and told him that the police sergeant had told him that Kinney should "go and take [himself] to get the medical attention. We don't have to take you." Kinney said, "Oh, no, no. I want you guys to take me because I would never let these guys get me in a situation where they say I broke away, he broke out, and they shoot me out on the streets like a dog." The ambulance driver told the sergeant what Kinney had said. The sergeant again began spitting in Kinney's face, and said, "Hey, I'm going to keep your ass here as long as I possibly can. I'm not going to charge you until the last second. I'm going to keep your ass here until Monday if I have to." Kinney said, "Okay. What else is new? Only thing I want to do is go and get some medical attention. Please, Tylenol, anything." He told one of the EMS workers, "Please look at me so in case they do some bodily harm to me, you'll be a witness." She said, "I will."

Approximately one-half hour after he had first requested medical attention, Kin-

ney was taken to St. Michael's Hospital by EMS. His shoulder was x-rayed and tested. Wondrak was with him in the emergency room. Kinney said to Wondrak, "Hey, as old as I am, I'm no threat to you and I don't know why or what possessed you to treat me like this here, you know. If I had been a younger man, like your age, I would have kicked your butt." Wondrak said to a nurse, "You heard that. You heard him say that he would have kicked my butt."

Kinney was given Tylenol and released. He was taken back to police headquarters, where he was held for three days. While Kinney was detained at the station in a cell, he saw six officers bring a naked man into the station. The officers were wearing leather gloves. They said, "You were out there in front of the store. You was acting all tough then. What about now?" They began to hit the other man. He said, "Please don't hit me." They continued. He screamed. One of the officers, who saw Kinney watching, said "Hey, they're not supposed to be beating nobody." The officers then took the naked man into another room. Kinney could hear the beating continue. He heard the man say "Please" and "Oh, man."

After his release, Kinney followed up his hospital visit with a visit to his own doctor, who said he had possibly pulled his deltoid muscle. The doctor gave him medicine and prescribed some therapeutic exercises, but Kinney was not able to use his shoulder to lift boxes at his store for approximately two and one-half weeks. He still suffers pain in the shoulder.

Although Kinney never sought mental health care, he has suffered mentally as a result of the incident. He is still afraid to be alone at his store. He pays someone to be there with him. Kinney filed a complaint with the city through the NAACP and through his councilman. A captain from the Police Review Board called Kinney concerning the incident, but Kinney refused to make a statement to the police review board.

Kinney's lawyer, Tom Horwitz, recommended to him that he enter the court's program for first-time offenders, the Selective Intervention Program, a program under which the misdemeanor charge against him would be dropped. When Kinney appeared in Cleveland Municipal Court to answer the charge, Horwitz requested that the court place him in the program.

The practice of the court is to require each participant in the SIP program to sign a standard release. The release reads as follows:

**RELEASE/CONTRACT**

I, Kinney, Eleare, the undersigned adult, for valuable consideration, the receipt of which is hereby acknowledged, do for myself, my heirs, executors, assigns, and administrators, release and discharge the City of Cleveland, State of Ohio, the Cleveland Police Department, the Cleveland Municipal Court, including its respective departments, the complainant(s) and/or victims P.O. Wondrak # 1513 from any and all claims, damages, actions, and causes of actions of any kind, civil or criminal, in State or Federal Courts, which may have arisen by reason of my arrest on or about 4–9–99 at which time I was charged with Obst. Off. Bus. 615.06.

I further state that the signing of this waiver is not to be taken in any fashion as an admission of any guilt and is a voluntary act and deed in exchange for admission to the Selective Intervention Program (S.I.P.)

I fully understand and accept the conditions of the Selective Intervention Program (S.I.P.). If accepted, I promise to

observe all the requirements thereof. If I violate any of the conditions of the Selective Intervention Program, I hereby waive all rights I may have and do consent to be returned to Court where my case will proceed as though I had not been in the Selective Intervention Program.

(Defs' Motion for Summary Judgment, Ex. C to Ex. G).

The SIP program is governed by Cleveland Mun. Ct. R. 4.15, which reads as follows: [3]

Each judge shall render a complete explanation of the Selective Intervention Program (SIP) and the fees to the defendant prior to referral to the Probation Department for screening for the program.

A. A defendant being considered for participation in the (SIP) program shall be screened by the Probation Department to determine eligability [sic] prior to being placed in the program.

B. If the defendant is found to be eligible, the defendant shall be assessed a probation fee of $100.00 for participation in the (SIP) program. The total fee shall be paid prior to the termination of the program, and shall be due and owing regardless of whether the termination of the program is by "nolle prosequi" or other judicial termination.

C. For good cause shown, the judge may waive the Probation SIP fee if the judge is satisfied that the defendant is indigent or otherwise unable to pay.

D. Pursuant to Ohio Revised Code §§ 737.41 and 2951.021 and City of Cleveland Ordinance No. 1249–95, the SIP fee shall be paid to the Clerk of Court who shall pay said fee directly to the Municipal Probation Service Fund.

It appears that Kinney or his attorney were made aware of the program fee (i.e., the $100 probation fee provided in R. 4.15(B)) at the brief hearing before Judge Triozzi of the Municipal Court. However, the court never mentioned on the record that a waiver and release was a requirement of the program. Neither Horwitz nor Kinney was aware that he would be required to sign such a release as a condition of the program. After the hearing, Kinney was taken to another floor of the courthouse. Horwitz was not present.

---

**3.** The defendants submitted the affidavit of Fred Turner, a probation officer of the Cleveland Municipal Court. Attached to the Turner Affidavit as Exhibit A is a typewritten page identified by Turner as Rule 4.13, governing the Selective Intervention Program. According to the Exhibit, Rule 4.13 provides that "A Release/Contract must be signed to participate [in the SIP]." It appears that the Exhibit to the Turner Affidavit is from an old, superseded version of the Rules. The latest revision to the Rules is dated June 26, 1996. The 1996 revision shows that Rule 4.15 is as the Court has quoted it, and that Rule 4.13 deals with electronic transmittal of criminal complaints, not with the SIP program. The Rule as submitted by the defendants became effective December 3, 1984 and has since been superseded.

Counsel for the defendants has informed the Court that Rule 4.13, attached to Turner's affidavit, is a rule of the probation department but not a rule of the Municipal Court. This representation is at odds with the Turner affidavit, which reads: "The guidelines and standards of the program have been promulgated by the Cleveland Municipal Court as Court Rule 4.13. (A copy of Court Rule 4.13 is attached as Exhibit 'A')." Although there may be some legitimate confusion about the status of the rule as submitted by the defendants, the Court finds, on the basis of the Turner Affidavit, that Turner was simply mistaken about the content of the Rules of the Municipal Court.

The Court holds that as of November, 1999, the date on which Kinney entered the SIP program and the date relevant to the issues in this case, the published Rules of the Cleveland Municipal Court did not require execution of a release as a condition of participation in the SIP program.

Kinney claims that someone had told Kinney and Horwitz that Kinney could not bring his counsel with him. Kinney spoke with a Fred Turner, a probation officer. Turner told him that he would be required to make certain payments and to keep certain appointments with his probation officer. Turner also explained the consequences of failure to comply with those conditions. Turner avers that he explained the release-dismissal agreement to Kinney, and that Kinney indicated he understood its terms and had no questions. Kinney denies that he was ever told about the terms of the agreement. He avers that he did not have a chance to read it; Turner simply told him to print his name and sign it. According to Kinney, Turner did not tell him that he was signing a release of his claims against Wondrak. If Kinney had known the contents of the document, he claims he would have defended against the charges in court rather than participate in the program. Kinney agrees that he was not threatened by anyone in connection with the release, and that he was not in custody when he signed it. Turner avers that Kinney was entitled to have his lawyer present at their meeting, and that had Kinney expressed any reluctance to sign the agreement, he would have rescheduled the signing of the release contract so that his attorney could be present.

## DISCUSSION

### A. Injunctive relief

■ Before turning to the question of the enforceability *vel non* of the release-dismissal agreement in this case, the Court addresses the issue of the Municipal Court's possible liability. Kinney's complaint seeks an injunction against the Municipal Court on the grounds that its policy of requiring a release as a condition of participation in the SIP violates the Seventh Amendment. Regardless of the merits of Kinney's constitutional arguments, he is not entitled to an injunction against the Municipal Court on his § 1983 claim. A state court is not a person within the meaning of § 1983. *Mumford v. Basinski,* 105 F.3d 264, 267 (6th Cir.1997). Therefore, Kinney is not entitled to relief against the Municipal Court, and the Municipal Court is entitled to summary judgment on Kinney's § 1983 claim.

The Court notes that the parties have not adequately briefed Kinney's standing to seek injunctive relief against the City or the possible constitutional, statutory, or prudential considerations weighing against such an injunction. Therefore, the Court declines to rule on the motions for summary judgment insofar as they relate to Kinney's claim for injunctive relief against the City. The Court directs the parties to brief the issues of standing and the appropriateness of injunctive relief at least thirty days prior to trial.

### B. Enforceability of the agreement in this case

The leading case on the enforceability of release-dismissal agreements is *Town of Newton v. Rumery,* 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987). There, the Supreme Court upheld an agreement between the government and a criminal defendant in which the defendant waived his right to sue under 42 U.S.C. § 1983 in return for the government's promise to dismiss the charge against him. A plurality of the Court held that the agreement was enforceable because (1) it was voluntary; (2) there was no evidence of prosecutorial misconduct; and (3) enforcement of the agreement would not adversely affect the relevant public interests. *Id.* at 398, 107 S.Ct. 1187. Justice O'Connor's concurrence provided the fifth vote for enforcing the agreement. She argued that the

burden of proving a release-dismissal agreement enforceable in a § 1983 action rested on the government. *Id.* at 401, 107 S.Ct. 1187 (O'Connor, J., concurring in part and concurring in the judgment). The Sixth Circuit has adopted Justice O'Connor's view, and places the burden of proof on the defendant. *Hill v. City of Cleveland,* 12 F.3d 575, 578 (6th Cir.1993). The Court considers the first and third factors, as there is no evidence of prosecutorial misconduct in this case.

### 1. Voluntariness

The plurality in *Rumery* prescribed the following factors for consideration when determining whether a release-dismissal agreement is voluntary: (1) the sophistication of the criminal defendant; (2) whether the defendant was in custody when the agreement was made; (3) whether the defendant was represented by counsel who drafted the agreement; and (4) whether the defendant had ample time to consider the agreement before signing it. *Rumery, supra* at 394, 107 S.Ct. 1187. Justice O'Connor suggested two additional factors: (5) the nature of the criminal charges; and (6) whether the agreement was formed under judicial supervision. *Id.* at 401–02, 107 S.Ct. 1187 (O'Connor, J.).

■ This Court holds that there are genuine issues of material fact with regard to voluntariness that preclude summary judgment for the defendants. Even in the light most favorable to Kinney, the Court would find that factors (1), (2), and (5) support a finding that the agreement was voluntary: Kinney is a somewhat sophisticated businessman; he was not in custody when he executed the agreement; and the charges against him were minor. Nevertheless, it is undisputed that Kinney's lawyer did not draft the agreement. Therefore, factor (3) weights against a finding of voluntariness. Moreover, on Kinney's ver-

sion of the facts, he had no time to consider the agreement before signing it, and while the standard-form agreement Kinney signed may have been drafted under judicial supervision, there are no facts to suggest that a judge exercised any particular supervision over entry into the agreement *in this case.* "A thorough inquiry by a judge will often establish that the participants are fully aware of the scope of the undertaking to which their assent is sought." *Livingstone v. North Belle Vernon Borough,* 12 F.3d 1205, 1213 (3d Cir. 1993). The transcript of the proceedings in the Municipal Court shows that no such "thorough inquiry" took place here. Indeed, the Municipal Court apparently failed to comply with the provisions of Rule 4.15, which require the judge to "render a *complete* explanation of the Selective Intervention Program (SIP) to the defendant prior to the referral to the Probation Department ..." (emphasis supplied). Therefore, factors (4) and (6) also weigh against voluntariness.

The Court also notes that Kinney avers that he was not allowed to have his lawyer present when he signed the release, and that it appears from the affidavit of Fred Turner, the probation officer who was with Kinney when he signed the release, that Turner incorrectly believed the Rules of the Municipal Court required Kinney to sign the release as a condition of entry into the SIP.

The record in this case, in the light most favorable to Kinney, shows much less voluntariness than existed in other release-dismissal cases. In *Rumery* itself, for example, the plaintiff's lawyer drafted the release-dismissal agreement and discussed its implications with him for about an hour. *Rumery, supra* at 390–91, 107 S.Ct. 1187. Likewise in *Burke v. Johnson,* 167 F.3d 276 (6th Cir.1999), the plaintiff and his lawyer had specifically discussed the terms

of the release-dismissal agreement, and while the district court did not specifically inquire into the voluntariness of the release-dismissal, it did inquire into the voluntariness of the contemporaneous guilty plea to criminal charges on the record. In *Hill, supra,* the plaintiff had over two months to decide whether to sign the agreement, which his lawyer drafted.

The defendants point out that in *DeFrank v. Roth,* No. 1:98CV1597, slip op. (N.D.Ohio Aug. 3, 1999) (Hemann, M.J.), the Court granted a motion for summary judgment on somewhat similar facts involving the Municipal Court's SIP and a release identical to the release in this case. But in *DeFrank,* the Court noted that the probation officer had explained the terms of the release to the plaintiff before she signed it. *Id.* at 8. That fact is disputed here. The plaintiff in *DeFrank* had four months to consider the agreement before signing it. *Id.* at 10. Finally, the Court in *DeFrank* concluded that the Rules of the Municipal Court required a release as a condition for participation in the program. *Id.* at 9. This conclusion is understandable, because an examination of the record in *DeFrank* shows that in *DeFrank* as in the instant case, a probation officer submitted an affidavit, attached to which was a copy of the same outdated version of Rule 4.13 that was attached to Turner's affidavit in this case, also identifying the rule as "Court Rule 4.13." (Ex. to Horwitz Aff.).

Thus *DeFrank* is easily distinguishable from this case, and to the extent the Court there relied on an affidavit including a superseded version of Rule 4.13, it should not be followed.

Because the Court finds that there are disputed issues of material fact concerning the voluntariness of Kinney's release, the defendants' motion for summary judgment on the grounds that the release constitutes a defense must be denied.

### 2. Public policy

■■■ Whether or not a jury would ultimately find that Kinney had signed the release-dismissal agreement voluntarily, the Court holds that the agreement is unenforceable as a matter of law. A finding of voluntariness alone is insufficient to render a release-dismissal agreement enforceable if the other *Rumery* factors are not met. *Coughlen v. Coots,* 5 F.3d 970, 974 n. 2 (6th Cir.1993); *Hill, supra* at 578 (both requiring more than proof of voluntariness to uphold an agreement). The agreement Kinney signed is not enforceable because the third factor of *Rumery* is not satisfied: the relevant public interests do not support enforcement.

■■■ The Court is persuaded by the Third Circuit's reasoning in *Cain v. Darby Borough,* 7 F.3d 377 (3d Cir.1993), a case that has not previously been cited by this Court or by the Sixth Circuit.[4] In *Cain,*

---

**4.** In an unpublished opinion, the Sixth Circuit reversed a trial court that enjoined a municipality from requiring a misdemeanor defendant from stipulating to probable cause for his arrest in return for a dismissal of the charge. *Prather v. City of Louisville,* 208 F.3d 214, 2000 WL 245424 (6th Cir.2000). But in *Prather,* the court did not provide any rationale for its holding, other than a citation to *Leaman v. Ohio Dept. of Mental Retardation & Development Disabilities,* 825 F.2d 946 (6th Cir.1987) (en banc). In *Leaman,* the plaintiff was a state employee whose § 1983 claim

was for wrongful discharge. The plaintiff there did not execute a release-dismissal agreement; rather, the court held that she had waived her right to bring a § 1983 claim by filing an action in the Ohio Court of Claims, because under an Ohio statute, filing such a claim operates as a waiver of any claims against individual state employees. In holding that *Rumery* supported enforcement of waiver, the court noted: "The inducement offered for Ms. Leaman's waiver (an opportunity to bring a direct action for damages against the State of Ohio) obviously lacked

the court squarely faced the question whether a release-dismissal agreement required as a condition for participation in a program like the SIP is enforceable. It focused its attention on the third element of *Rumery:* whether such an agreement was supported by the relevant public interests. The court proposed a two-pronged test. First, the release-dismissal agreement must *objectively* meet the public interest requirement, based on the facts known to the prosecutor when the agreement was reached. Second, the reasons proffered by the prosecutor for the release-dismissal agreement must be the *actual reasons* he sought the release. *Cain, supra* at 381. The court also noted the public policies that the *Rumery* plurality had held might justify enforcement of a release-dismissal agreement. First is the interest in protecting the public fisc from the costs of defending against "marginal" or "frivolous" § 1983 claims. Second is the interest in "resolving minor criminal charges while allocating the scarce resources of the criminal justice system to the prosecution of more serious charges." *Id.* at 380 (citing *Rumery, supra* at 395–96, 107 S.Ct. 1187).[5]

The court reasoned that the blanket requirement of a release made no attempt to distinguish between frivolous and meritorious [§ 1983] litigation; it indiscriminately curtails both. *Id.* at 383. The court continued: "We believe that under *Rumery*

the potential for coercion inherent in the inducement (dismissal of criminal charges) offered for the waiver in Rumery." *Id.* at 954. The *Leaman* court recognized that the use of release-dismissal agreements in the *criminal* context presents special problems of coerciveness. Thus the Court doubts the strength of the unexplained holding of *Prather*. An unpublished opinion is not binding precedent. *Rosales–Garcia v. Holland,* 238 F.3d 704, 715 n. 16 (6th Cir.2001); *Salamalekis v. Commissioner of Soc. Sec.,* 221 F.3d 828, 833 (6th Cir.2000); *Honigman v. Comerica Bank (In re*

there must be a case-specific showing that the released civil rights claims appeared to be marginal or frivolous at the time the agreement was made and that the prosecutor was in fact motivated by this reason." *Id.* Thus, it held Cain's release unenforceable.

The reasoning in *Cain* is persuasive. If (1) the burden to prove that enforcement of a release-dismissal agreement is supported by public policy is on the defendants in a § 1983 suit, (2) public policy supports release-dismissal agreements that save the costs of defending against "frivolous" or "marginal" § 1983 claims, and (3) the defendants concede that they apply the requirement of a release-dismissal agreement in every SIP case regardless of the potential merits of the § 1983 claim, then even if the defendants can show, *post facto,* that the § 1983 suit in question was, in fact, without merit, they cannot possibly meet *Cain's* subjective prong. That is, they cannot possibly show that they required a release because they determined that the § 1983 suit lacked merit (or that other public policies supported a release-dismissal agreement). The defendants could very well argue that *Cain* was wrong to impose a subjective as well as an objective burden on the defendants. But this Court agrees with the Third Circuit that

[a]ny alternative to the "actual reason" requirement creates the real danger

*Van Dresser Corp.),* 128 F.3d 945, 948 (6th Cir.1997). Therefore, the Court will not follow *Prather.*

5. In cases after *Rumery,* courts have identified other public policies that might justify enforcement of a release-dismissal agreement. *E.g., Livingstone v. North Belle Vernon Borough,* 12 F.3d 1205 (3d Cir.1993) (concern for trauma to potential witnesses in the criminal prosecution); *Coughlen, supra* (unavailability of witnesses and evidence).

that actions taken pursuant to an improper motive, such as to protect public officials from a meritorious civil rights lawsuit, may be legally excused because a court later finds that some "benefit" has been incidentally achieved.

*Cain, supra* at 381.

For the foregoing reasons, this Court agrees with Kinney that even viewing the facts in the light most favorable to the defendants, the release-dismissal agreement he signed is not enforceable because it is not supported by the relevant public policies.[6]

## CONCLUSION

For the foregoing reasons, the Court holds that the release-dismissal agreement executed by Kinney is unenforceable as a matter of law, and that the Municipal Court is not subject to suit under § 1983. Accordingly, the defendants' motion (docket no. 23) is granted in part and denied in part, and Kinney's motion (docket no. 21) is granted in part and denied in part. The Court reserves judgment on the two motions insofar as they address Kinney's claim for injunctive relief against the City or the merits of Kinney's § 1983 and tort claims. As noted above, the Court directs the parties to brief the issues of Kinney's standing to seek an injunction against the City and the appropriateness of injunctive relief thirty days before trial. The Court also directs the parties to brief the distinction, if any, between the § 1983 claim and the common law claims with regard to the

enforceability of the release-dismissal agreement thirty days before trial.

IT IS SO ORDERED.

---

**6.** The Court notes that in *Hill v. City of Cleveland*, No. 1:90CV2268, slip op. (N.D. Ohio Feb. 3 1992) (Aldrich J.), *aff'd* 12 F.3d 575 (6th Cir.1993), it upheld the validity of a release-dismissal agreement under *Rumery*, specifically finding that the agreement did not violate the public interest. But in *Hill*, the agreement was not a blanket requirement for participation in the SIP, but rather, a negotiated agreement reached after a mistrial. *Id.* at 3–4. Therefore, *Hill* does not raise the issue presented in this case, namely, whether the blanket nature of the release requirement renders the agreements unenforceable.