NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 15a0517n.06

Case No. 13-4321

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 22, 2015
DEBORAH S. HUNT, Clerk

BRIAN D. PATTERSON and DEREK J.
PATTERSON,

    Plaintiffs-Appellants,

v.

CITY OF AKRON, OHIO, et al,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF
OHIO

OPINION

BEFORE: KETHLEDGE and DONALD, Circuit Judges; McCALLA, District Judge.[*]

    **BERNICE BOUIE DONALD, Circuit Judge.** Plaintiffs-Appellants, brothers Derek and Brian Patterson, brought this civil rights action alleging that five City of Akron police officers, their superiors, and the City of Akron violated their constitutional rights through the use of excessive force. On the night of May 27-28, 2006, during Memorial Day weekend, the brothers were patrons at a bar in downtown Akron, Ohio. Officers arrested Brian Patterson after twice telling him to stop sitting or leaning on a police cruiser. A large crowd gathered and chaos ensued. Under circumstances that remain disputed, Derek Patterson attempted to intercede during his brother's arrest. It is undisputed that Brian Patterson was tased by an officer at least

---

[*]The Honorable Jon P. McCalla, United States District Judge for the Western District of Tennessee, sitting by designation.

once and Derek Patterson was tased by officers at least four times. The district court granted summary judgment to the Defendants-Appellees on all of Brian Patterson's claims, finding that he had waived any potential civil claims against the officers and the City in a valid Release-Dismissal Agreement entered at the time of Brian's plea to a misdemeanor charge of resisting arrest. After the district court granted summary judgment to most of the Defendants-Appellees on most of Derek Patterson's claims, a jury returned a verdict in favor of the two remaining defendant officers.

Brian Patterson appeals the district court's enforcement of the Release-Dismissal Agreement. Derek Patterson appeals the district court's ruling that an officer's Taser Report was inadmissible at trial. We find (1) Brian's Release-Dismissal Agreement is unenforceable, and therefore reverse the district court's grant of summary judgment to the officers, and (2) the district court erred in excluding the officer's Taser Report at Derek's trial, and that error was not harmless. We therefore **REMAND** the matter for new trial as to both plaintiffs.

I.

A.

Derek ("Derek") and Brian ("Brian") Patterson are natives of a suburb of Akron, OH. After graduating from Ohio University in 2004, older brother Derek moved to Bradenton, Florida, where he became a math teacher at a high school in Sarasota, Florida and a youth counselor at the Sarasota Boys and Girls Club. (R. 51-7, Derek Dep., PageID #559.) Brian, after two years at Ohio University, left school and moved to Florida to live with Derek. (R. 51-8, Brian Dep., PageID #579-80.) He worked as a full-time landscaper at the Gulf & Bay Club in Sarasota.

The events in question took place in the early morning hours of May 27-28, 2006, over Memorial Day weekend. Derek and Brian had returned to Akron to spend the holiday with their family. Sometime between 11:00 and 11:30 pm, Derek and Brian arrived separately with friends at Fat Tuesday Bar in downtown Akron, near the University of Akron. (R. 51-8, Brian Dep., PageID #51-8; R. 138, Trial Tr. Vol 1-A, PageID #1735-36.) Fat Tuesday neighbors Posh Night Club, and patrons of both venues often gather on the sidewalk to mingle, particularly when there is nice weather, as there was that holiday weekend. (R. 51-8, Brian Dep., PageID #581, 583; R. 138, Trial Tr. Vol 1-A, PageID #1740; R. 51-13, Monaghan Dep., PageID #624; R. 140, Trial Tr. Vol. 3, PageID #1930.) Derek left Fat Tuesday around 2:15 am, leaving Brian inside. (R. 138, Trial Tr. Vol 1-A, PageID #1738-40.) Derek went outside and leaned against a police cruiser parked at the curb, facing the bars and watching patrons exit. (*Id.* PageID #1740, 1742.) Derek was leaning against the cruiser for about five minutes; when Fat Tuesday closed, Brian exited and joined Derek in leaning against the cruiser. (*Id.* Page #1741; *see also* R. 51-8, Brian Dep., PageID #582-83.) After a couple minutes, Derek left to go speak to someone he had met in the bar earlier, leaving Brian leaning against the cruiser and talking to his friend Kara Monaghan ("Monaghan"). (R. 138, Trial Tr. Vol 1-A, PageID #1741-42; R. 51-8, Brian Dep., PageID #582.)

Akron Police Sergeant Timothy Givens and Officer Michael Rinn were working the Downtown Bar District patrol assignment that evening. (R. 140, Trial Tr. Vol. 3, PageID #1921-25.) Officer Daniel Bickett was working off-duty security at Posh Night Club. (*Id.* PageID #2157.) All three officers were standing together on the sidewalk as Fat Tuesday and Posh closed. (*Id.* PageID #1928-29, 2162.) Several hundred people were outside the bars. (*Id.* PageID #1930.) Sergeant Givens and Officer Bickett testified that they observed Brian sitting on

the trunk of Sergeant Givens' cruiser with his feet dangling, and that Sergeant Givens walked over to tell Brian to get off his vehicle. (*Id.* PageID #1928-30; R. 51-12, Bickett Dep., PageID #618.) The parties agree Brian stood up without saying anything. (R. 51-8, Brian Dep., PageID #583; R. 51-10, Givens Dep., PageID #605; R. 140, Trial Tr. Vol. 3, PageID #1930.)

Sergeant Givens testified that as he walked away, he turned and saw Brian leaning on the cruiser. (R. 140, Trial Tr. Vol. 3, PageID #1931-32.) Sergeant Givens testified that he again told Brian to get off his vehicle and began ordering the crowd to leave the area. (*Id.*) According to Sergeant Givens, Brian took a puff of his cigarette and told Sergeant Givens that he was not leaving. (*Id.* PageID #1932.) Sergeant Givens testified he told Brian he could either leave or go to jail, to which Brian allegedly replied, "I'm not leaving and I'm not going to jail." (*Id.* PageID #1934.) Officer Bickett also testified that Brian said this. (R. 51-12, Bickett Dep., PageID #619.) Sergeant Givens, believing Brian to be intoxicated and observing him take a defensive posture, decided to arrest Brian. (R. 140, Trial Tr. Vol. 3, PageID #1934-35.) On Sergeant Givens' instruction, Officers Rinn and Bickett approached to assist Sergeant Givens in effectuating the arrest. (*Id.* PageID #1935.)

Brian testified that, about thirty seconds after Sergeant Givens first approached him, Sergeant Givens returned and asked him "why'd you do that," to which Brian did not respond because he did not know what Sergeant Givens was referring to. (R. 51-8, Brian Dep., PageID #583-84.) Sergeant Givens then told the other officers behind him to arrest Brian. (*Id.* PageID #584.) Monaghan testified that, after Brian stood up after first being approached by Sergeant Givens, she and Brian talked for "a couple more minutes" before Brian inadvertently leaned against the cruiser again. (R. 51-13, Monaghan Dep., PageID #625.) Monaghan testified that that's when the police "grabbed [Brian] up" and put his hands behind his back. (*Id.*)

Monaghan ran over to Derek and told him Brian was being arrested. (*Id.*; *see also* R. 138, Trial Tr. Vol 1-A, PageID #1742-43.) Derek walked over and saw Brian standing between Officers Rinn and Bickett with his hands handcuffed behind him. (R. 138, Trial Tr. Vol 1-A, PageID #1743.) Derek approached Officer Rinn, told him Brian was his brother, and asked what was happening. (R. 51-7, Derek Dep., PageID #566; R. 138, Trial Tr. Vol 1-A, PageID #1743.) Officer Rinn told Derek that Brian was being arrested and needed to get into the police cruiser. (R. 51-7, Derek Dep., PageID #566; R. 138, Trial Tr. Vol 1-A, PageID #1743.) Derek asked Officer Rinn for permission to talk to Brian so that he could "ease the situation," which Officer Rinn granted. (R. 51-7, Derek Dep., PageID #566-67; R. 138, Trial Tr. Vol 1-A, PageID #1744; R. 51-8, Brian Dep., PageID #585.)

According to Derek, he said to Brian, "Look, this man is being reasonable. Get in this police cruiser. Let me talk to him. We might all be able to go home tonight." (R. 138, Trial Tr. Vol 1-A, PageID #1744-45.) Brian responded by saying he did not know why the officers handcuffed him. (*Id.* PageID #1745.) When Brian said this, Sergeant Givens allegedly yanked Brian by his left arm from the sidewalk into the street and tried to body slam him. (*Id.*) Officer Bickett assisted Sergeant Givens in moving Brian. (R. 51-7, Derek Dep., PageID #567-68.) When Derek followed Sergeant Givens and Brian into the street, Officer Rinn grabbed Derek by his right arm; when Derek pulled his arm away, Officer Rinn told him not to get involved. (R. 138, Trial Tr. Vol 1-A, PageID #1753.)

According to Sergeant Givens and Officer Bickett, Brian resisted their efforts to place him in Sergeant Givens' police cruiser. (R. 140, Trial Tr. Vol. 3, PageID #1938-93; R. 141, Trial. Tr. Vol. 4, PageID #2174-76.) Officer Bickett testified he encouraged Brian to "sit down in the cruiser" so that they could "work this out." (R.141, Trial. Tr. Vol. 4, PageID #2176.)

Officer Bickett further testified that, during this time, Officer Rinn was trying to hold back the crowd that was forming around the officers and moving in closer. (*Id.*) Because of the encroaching crowd, Sergeant Givens and Officer Bickett decided to move Brian from the passenger side of the cruiser to the driver's side. (R. 140, Trial Tr. Vol. 3, PageID #1939; R.141, Trial. Tr. Vol. 4, PageID #2176-78.) Now on the driver's side, Brian again resisted, refusing to bend down to get into the cruiser and kicking his legs out. (R. 140, Trial Tr. Vol. 3, PageID #1939; R.141, Trial. Tr. Vol. 4, PageID #2178.) Derek perceived Brian's actions as him trying to "stabilize himself so as not to be slammed on his face." (R. 51-7, Derek Dep., PageID #568; *see also* R. 138, Trial Tr. Vol 1-A, PageID #1753-54.) Likewise, Brian also perceived that the officers were trying to slam him to the ground. (R. 51-8, Brian Dep., PageID #585.)

According to Sergeant Givens and Officer Bickett, a crowd of about 10 to 12 people had followed the officers to the driver's side of the cruiser, and was now pulling at the officers and at Brian. (R. 140, Trial Tr. Vol. 3, PageID #1939; R.141, Trial. Tr. Vol. 4, PageID #2178-80.) According to Monaghan, the crowd was predominately white, and people in the crowd were shouting that the officers were racist. (R. 51-13, Monaghan Dep., PageID #627-28.)[1] According to Derek, Officer Bickett, and Anthony Gary ("Gary") (a witness, possible participant, and friend of Derek and Brian), the crowd was also shouting, "police brutality." (R. 51-7, Derek Dep., PageID #568-69; R. 51-9, Gary Dep., PageID #598; R.141, Trial. Tr. Vol. 4, PageID #2178.)

The crowd separated Sergeant Givens from Officer Bickett and Brian, and both officers independently radioed for assistance. (R. 140, Trial Tr. Vol. 3, PageID #1940-41; R.141, Trial.

---

[1]Monaghan states all the officers were white, and that Brian is biracial. (R. 51-13, Monaghan Dep., PageID #627-28.) This would also make Derek biracial, as he and Brian share both of the same parents. (Appellant's Br. at 9.) Derek and Brian are identified as African American in their appellate brief. (*Id.* at 13.)

Tr. Vol. 4, PageID #2181-82.) Officer Karl Burton responded to the call almost immediately.[2] Sergeant Givens testified that the crowd then numbered 15 to 20 people, and that he, Officer Bickett, and Brian were now in the middle of the street. (R. 140, Trial Tr. Vol. 3, PageID #1951.) When Officer Burton arrived, he helped Officer Bickett secure Brian. The crowd still surrounded them. (R. 141, Trial. Tr. Vol. 4, PageID #2182.) Officer Bickett testified that he attempted to hold the crowd back with forearm strikes, kicks, and "sparking" his taser three to four times. (*Id.* PageID #2182-83.)

Sergeant Givens and Officer Bickett provide conflicting accounts regarding what happened next. Sergeant Givens testified that, when Officer Burton grabbed ahold of Brian, Gary jumped on Officer Burton's back. (R. 140, Trial Tr. Vol. 3, PageID #1951.) Sergeant Givens states he tased Gary, handcuffed him, and put him into a patrol wagon. (*Id.* PageID #1951-55.) Brian's testimony somewhat corroborates this version of events; specifically, Brian testified that he saw Gary on the ground after being tased, with an officer standing in front of him. (R. 51-8, Brian Dep., PageID #586.)[3]

Officer Bickett, however, testified that Derek was "hanging on [Officer] Burton's back trying to pull [Officer Burton] off Brian." (R.141, Trial. Tr. Vol. 4, PageID #2183-84, 2269.) Officer Bickett then let go of Brian and unsuccessfully attempted to handcuff "Derek,"[4] who stiffened and pulled away from him. (*Id.* PageID #2184.) By this time, Officer Kevin Evans had arrived and proceeded to assist Officer Bickett. (*Id.* PageID #2184-85.) The officers, standing

---

[2]Other officers were in the immediate area, patrolling other bars.

[3]Gary testified that he observed the officers dragging Brian into the street. (R. 138, Trial Tr. Vol 1-A, PageID #1700-01.) Gary stated that, as the officers were dragging Brian, Gary stepped into the street and began filming the scene with his cellphone camera. (*Id.* PageID #1701.) Gary further testified that he was tased as he was filming. (*Id.*)

[4]It remains unclear whether this individual actually was Derek. Both Sergeant Givens and Derek testified that the individual who attacked Officer Burton was not Derek.

on either side of "Derek," got him down on all fours; Officer Bickett tried to pull "Derek's" arm behind his back. (*Id.* PageID #2185-86.) Officer Patrick Didyk, who was also on patrol in the area, arrived and began to assist Officers Bickett and Evans' efforts to restrain "Derek." (*Id.* PageID #2321-22.) Suddenly, Officer Bickett was knocked off "Derek." (*Id.* PageID #2186.) Officer Bickett was unaware of who or what hit him. (*Id.*)

Meanwhile, Brian was tased in the chest by Officer Evans. (R. 51-8, Brian Dep., PageID #586; R. 51-15, Brian Decl., PageID #640(¶4).) In Brian's account, there are no interceding events between when he noticed Gary on the ground after Gary was tased, and when Brian himself was tased—allegedly without provocation. According to Officer Evans, however, a handcuffed Brian broke away from Officer Burton, ran toward Derek and Officers Evans and Bickett, and struck Officer Bickett in the head with his knee, causing Officer Bickett to fall over. (R. 51-14, Evans Dep., PageID #635-36; R. 140, Trial Tr. Vol. 3, PageID #2081-83.) At that point, Officer Evans stood up and deployed his taser in "dart mode"[5] on Brian. (R. 51-14, Evans Dep., PageID #636; R. 140, Trial Tr. Vol. 3, PageID #2081-84.)

Brian fell face first to the ground. (R. 51-14, Evans Dep., PageID #636-37; R. 140, Trial Tr. Vol. 3, PageID #2084.) Brian testified that after he fell to the ground—still handcuffed from

---

[5]In *Bryan v. MacPherson*, the Ninth Circuit explained that in dart mode a taser

> uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the [taser] by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the [taser] delivers a 1200 volt, low ampere electrical charge. . . . The electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless.

630 F.3d 805, 824 (9th Cir. 2010) (footnote omitted).

earlier in the evening—Officer Evans continued to "drive stun"[6] him in the back, left leg, and buttocks. (R. 51-8, Brian Dep., PageID #587, 589.) Brian further testified that an unidentified officer had his knee on Brian's head and gouged him in his left eye. (*Id.* PageID #586.) Officer Evans testified he only tased Brian once.

In Derek's account, he did not enter the melee until after Officer Rinn refused to intercede and after he observed Brian being tased by Officer Evans. (Appellant's Br. at 12; R. 51-7, Derek Dep., PageID #568; R. 138, Trial Tr. Vol 1-A, PageID #1753-54.) Derek testified that, as he attempted to run toward Brian, he was tackled by an officer—presumably Officer Didyk—and fell to his hands and knees.[7] According to Derek, Officer Didyk and Officer Bickett then each held onto one of his arms and tried to pull Derek's arms out from under him. (Appellant's Br. at 13) (citing R. 51-7, Derek Dep., PageID #570-71.)

However Derek became involved, the result is that Derek ended up on the ground and either could not or would not lie flat on his stomach. Derek testified that he could not produce his hands and arms because the officers were on his back and doing so would have caused him to fall face-first into the concrete. (R. 51-7, Derek Dep., PageID #571.) The two officers testified that Derek would not submit. Officer Bickett testified that he administered a single-cycle drive

---

[6]In *Mattos v. Agarano*, the Ninth Circuit explained:

> When a taser is used in drive[]stun mode, the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode.

661 F.3d 433, 443 (9th Cir. 2011).

[7]In their response in opposition to Defendants' motion for summary judgment, Derek argued that, by process of elimination, it could only have been Officer Didyk who tackled Derek because Derek was only tackled by one officer; Officer Didyk admitted to being on top of Derek; and Officer Bickett testified he did not tackle Derek. (R. 51, Pls.' Resp. Opp'n Summ. J., PageID #495 n.6.)

stun with his taser to the back of Derek's left thigh, and Officer Didyk testified that he administered a single-cycle drive stun with his taser to Derek's left lower back. (R. 141, Trial Tr. Vol. 4, PageID #2187, 2325.) Officer Didyk testified that Derek then laid flat on his stomach, but refused the Officers' commands and efforts to produce his hands from under his torso to be handcuffed. (*Id.* PageID #2326.) Officer Bickett testified he deployed a second, single-cycle drive stun to Derek's right shoulder blade, and Officer Didyk testified that he deployed a second, single-cycle drive stun to Derek's left thigh. (*Id.* Page ID # 2191, 2327). At that point, the two officers were able to gain control of Derek's arms and handcuff him. Derek testified, however, that as he lay on the ground Officer Bickett continued to drive stun his neck (twice), shoulder (twice), and the back of his head (once), for a total of five stuns after he was handcuffed and on the ground. (R. 138, Trial Tr. Vol. 1-A, Page ID #1760; R. 51-7, Derek Dep., PageID #571-572; RE 51-18, Derek Decl. Page ID # 660-662(¶5).).

B.

On May 30, 2006, Derek was indicted on charges of disorderly conduct, obstructing official business, and resisting arrest—all misdemeanors. He pled no contest to disorderly conduct, Ohio Rev. Code § 2921.33, in September 2006, in exchange for the other charges being dropped. (R. 39-14, Plea Proceedings Tr., PageID #402-03.)

Brian was indicted for the felony of assault on a police officer, Ohio Rev. Code § 2903.13, and the misdemeanor of resisting arrest, Ohio Rev. Code § 2921.33. On January 16, 2007, Brian appeared for a plea hearing, where stand-in counsel represented him. Brian asserts that, approximately 15 minutes before the hearing, stand-in counsel told him that an offer of a no-contest plea to the misdemeanor had been made, but was conditioned on release of all civil claims related to the officers' actions. (Appellant's Br. at 14.) Brian avers that twice he was told

not to worry about accepting the offer, because it was his first offense and he could expunge the offense and, with it, the agreement. (R. 51-8, Brian Dep. Page ID # 589-90.) Brian agreed, pleaded no contest to the misdemeanor and, in exchange for the dropping of the felony charge, entered into a Release-Dismissal Agreement. On the record at the plea proceeding, Brian stated that he agreed "not to institute any lawsuit against any of the police officers involved or the City of Akron in this case." (R. 39-13, Plea Proceedings Tr., PageID #387.)

On May 28, 2008, Derek and Brian filed the instant civil rights lawsuit, alleging: (1) the defendant officers (Givens, Rinn, Bickett, Evans, and Didyk)[8] violated their rights under Title VII, 42 US.C. §1983, and the Fourth Amendment; (2) the City of Akron, Chief Michael Matulavich, and Lieutenant Melissa Schnee ("Lieutenant Schnee"), by their indifference, implicitly authorized the unconstitutional conduct of the other defendants, failed to sufficiently train the other defendants, and failed to supervise them; (3) defendants were involved in a conspiracy, under 42 U.S.C. §1985, to violate Derek and Brian's civil rights; (4) intentional infliction of emotional distress; and (5) negligent training, supervision and retention.

The district court bifurcated summary judgment proceedings in order to first resolve the question of qualified immunity. *Patterson v. City of Akron*, No. 5:08CV1300, 2009 WL 2733522, at *3 n.8 (N.D. Ohio Aug. 26, 2009). Defendants-Appellees filed a motion for summary judgment on the basis of Brian's waiver of his claims at the time of his plea, and on the grounds that qualified immunity protected them from the brothers' excessive force claim. (R. 39, Defs.' Mot. Summ. J., PageID #218-250.) The district court granted summary judgment on all of Brian's claims and denied the officers' claim to qualified immunity as to Derek. *Patterson*, 2009 WL 2733522, at *7, *adhered to on reconsideration*, No. 5:08CV1300, 2013 WL 1701578

---

[8]Officer Burton was not sued.

(N.D. Ohio Apr. 18, 2013). This Court affirmed the district court's qualified immunity ruling. *Patterson v. City of Akron*, Case No. 09-4131 (Order, March 9, 2011).

The Defendants-Appellees then filed a second motion for summary judgment on Derek's §1983 municipal liability claim, the §1985 claim, and the Ohio state law tort claims. (R. 89, Defs.' Mot. Summ. J., PageID #1032-1055.) The district court granted the motion. *Patterson v. City of Akron*, No. 5:08CV1300, 2012 WL 3913082, at *10 (N.D. Ohio Sept. 7, 2012). As a result, all that remained was Derek's §1983 excessive force claim against Officers Bickett and Didyk. That claim proceeded to a five-day jury trial on September 16-20, 2013. The jury returned a verdict in favor of the two officers.

II.

We first address Brian's claim that the district court erred in finding the Release-Dismissal Agreement enforceable, and therefore in granting summary judgment in favor of the defendants.

Our review of a district court's grant of summary judgment is de novo. *See Medical Mut. of Ohio v. k. Amalia Enters. Inc.*, 548 F.3d 383, 389 (6th Cir. 2008). Summary judgment is appropriate "if the pleadings, the discovery and the disclosure materials on file, and any affidavits 'show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). There is "no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id.* (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In deciding the motion, "the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008) (citing

*Matsushita*, 475 U.S. at 587). However, "the mere existence of a scintilla of evidence in support of the non-moving party is insufficient to defeat a motion for summary judgment." *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

In *Town of Newton v. Rumery*, the Supreme Court held that release-dismissal agreements, by which an accused agrees not to bring a § 1983 action in exchange for the dismissal of criminal charges, are not *per se* invalid. 480 U.S. 386, 392 (1987). However, in order to be found valid and therefore enforceable, the agreement must satisfy certain criteria. *Id.* at 397-98. The Supreme Court looked to three general considerations when determining whether enforcement of a release-dismissal agreement is appropriate: whether it was entered into voluntarily; whether there is evidence of prosecutorial misconduct; and whether enforcement furthered the public interest. *Id.* In a concurrence, Justice O'Connor emphasized that "it is the burden of those relying upon such covenants to establish that the agreement is neither involuntary nor the product of an abuse of the criminal process." *Id.* at 399 (O'Connor, J., concurring in part and concurring in the judgment). The general considerations announced by the *Rumery* plurality, coupled with Justice O'Connor's additional point, have since become the governing law of this Circuit. Specifically, in *Coughlen v. Coots*, this Court held:

> [B]efore a court properly may conclude that a particular release-dismissal agreement is enforceable, it must specifically determine that (1) the agreement was voluntary; (2) there was no evidence of prosecutorial misconduct; and (3) enforcement of the agreement will not adversely affect relevant public interests. The burden of proving each of these points falls upon the party in the § 1983 action who seeks to invoke the agreement as a defense.

5 F.3d 970, 974 (6th Cir. 1993). Applying this framework, we find that Defendants-Appellees have not met their burden with respect to any prong of the *Rumery* analysis. We therefore

reverse the district court's finding that Brian entered a valid, enforceable Release-Dismissal Agreement.

### 1. *Voluntariness*

Under the first prong of the *Rumery* analysis, in order for a release-dismissal agreement to be enforceable, the defendant officers must show that the agreement was the result of "an informed and voluntary decision." *Rumery*, 480 U.S. at 393. More specifically, the voluntariness inquiry takes into consideration: (1) the sophistication of the criminal defendant; (2) whether the defendant was in custody when he made the agreement; (3) whether the defendant was represented by counsel who drafted the agreement; and (4) whether the defendant had ample time to consider the agreement before signing it. *Id.* at 394. In her concurrence, Justice O'Connor also counseled consideration of (5) the nature of the criminal charges and (6) whether the agreement was formed under judicial supervision. *Id.* at 401-02 (O'Connor, J., concurring in part and concurring in the judgment).

The district court found that each of these six factors weighed in favor of finding Brian entered the Release-Dismissal Agreement voluntarily. *Patterson*, 2009 WL 2733522, at *3-5. We disagree. Genuine issues of material fact as to whether these factors weigh in favor of a finding of voluntariness preclude summary judgment in the Defendants-Appellees' favor.[9] *See Marshall v. City of Farmington Hills*, 578 F. App'x 516, 522-23 (6th Cir. 2014); *cf. Burke v. Johnson*, 167 F.3d 276, 285 (6th Cir. 1999) (holding that a party seeking to enforce an oral release-dismissal agreement had to prove voluntariness by a preponderance of the evidence).

---

[9]In granting summary judgment to the Defendants-Appellees, the district court briefly noted that "Brian's version of the events differs significantly from that of the officers." *Patterson*, 2009 WL 2733522, at *1. The district went on, however, to present a version of the facts which appears to presume the truth of the officers' account.

We begin with the second *Rumery* factor, whether the defendant was in custody when he made the agreement, because it is the simplest to address on the facts of this case. Brian was not in custody at the time he entered into the agreement. Accordingly, this factor weighs in favor of finding the agreement was voluntarily entered, as the district court found. *Patterson*, 2009 WL 2733522, at *4.

As to the first factor, there is a genuine factual question as to whether Brian was a sophisticated criminal defendant. He was 22-years-old at the time of these events, and had never before been arrested or charged with a criminal offense. (R. 51-8. Brian Dep., PageID #578; R. 51-24, Journal Entry, PageID #682.) Further, because he had attended only a couple of years of college and worked as a non-professional, he is quite unlike the plaintiff in Rumery, a "sophisticated businessman" who was found to have voluntarily entered the release-dismissal agreement at issue in his case. *Rumery*, 480 at 394; *cf. Burke v. Johnson*, 167 F.3d 276, 285 (6th Cir. 1999) (finding that "[a]lthough Burke's 'sophistication' may not be that of the educated businessman defendant in *Rumery*," voluntariness could be found because Burke had a modest educational background, could read and write, and was "street wise" in that the relevant encounter with the police "was not his first contact with the criminal justice system."). The district court considered some of this evidence of Brian's inexperience, but found that Brian's assertion that he was not a sophisticated criminal defendant "has no merit given the clear questioning of the state court judge and Brian's answers, as reflected in the transcript of those proceedings[.]" *Patterson*, 2009 WL 2733522, at *3. The relevant portion of the plea hearing transcript, as cited by the district court, reads as follows:

> THE COURT: All right. Also as a condition of the plea bargain in this case that is in consideration of you being offered a plea to the misdemeanor and not the felony charge, it is the Court's understanding that you have agreed in return for

- 15 -

that consideration not to institute any lawsuit against any of the police officers involved or the City of Akron in this case; is that correct?

THE DEFENDANT: Yes.

THE COURT: Has anybody forced you, coerced you, or promised you anything in order to get you to make that decision?

THE DEFENDANT: No.

THE COURT: And that has been a decision made of your own volition and free will?

THE DEFENDANT: Yes.

(R. 39-13, Plea Proceedings Tr., PageID #394.)  This was the only evidence of sophistication cited by the district court.

We do not underestimate the significant role that plea colloquies such as this generally play in our criminal justice system.  These types of colloquies are often cited as proof that a criminal defendant intelligently, knowingly, and voluntarily entered into a particular plea agreement.  Nonetheless, we do not think that a defendant's one-word answers during a plea colloquy, standing alone, are compelling evidence that he is sophisticated.  Sophistication, in the context of the *Rumery* analysis, speaks to whether the defendant had or should have had sufficient knowledge of or familiarity with the criminal justice system such that we have faith that he knew or should have known what he was bargaining for when he entered a release-dismissal agreement.  Given Brian's relative youth, non-professional background, and lack of prior experience with the criminal justice system, there is room to question whether he is the kind of sophisticated criminal defendant contemplated by *Rumery* Court.

This is especially true when one considers Brian's arguments regarding the third *Rumery* factor.  There is a genuine factual issue in this case as to whether's Brian's lack of sophistication

was exacerbated by his stand-in counsel's lack of experience. Brian notes that, at the time of his plea hearing, his substitute counsel had graduated from law school less than a year before the hearing and had been licensed to practice for approximately eight weeks. (Appellant's Br. at 21; *see also* R. 51-22, Ohio Supreme Court Curriculum Vitae of Matthew Rizzi, PageID #678.) Viewed in the light most favorable to him, it is reasonable to infer that the representation Brian received at the hearing did not offset his own lack of sophistication regarding the criminal process. *Cf. Hill v. City of Cleveland*, 12 F.3d 575, 578 (6th Cir. 1993) (finding that, "although Hill lacked sophistication, unlike the criminal defendant in *Rumery*, his lack of sophistication was offset by the presence of a knowledgeable and experienced defense attorney.") That is to say, although Brian "was represented by counsel who drafted the agreement," *Rumery*, 480 U.S. at 394,—or at least participated in the drafting of the agreement—the counsel in question was as inexperienced as Brian was unsophisticated. Brian's stand-in counsel is the antithesis of the "experienced criminal defense attorney" who represented Rumery, and who in fact soon became the local district attorney. *Rumery*, 480 U.S. 390; *see also id.* n.1.

This district court, however, found that Brian's argument regarding his stand-in counsel "also has no merit," for three reasons. *Patterson*, 2009 WL 2733522, at *4. First, the district court noted that, although stand-in counsel was present at the proceedings, Brian "was actually represented by three retained attorneys, two of whom were experienced." *Id.* at *4 n.10. Thus, the district court suggested, the inexperience of stand-in counsel was somehow offset by the experience of Brian's other two attorneys of record. The district court cited no legal authority supporting this proposition. Further, as a practical matter, it is irrelevant whether there was other counsel of record if none of those other attorneys were present at the plea hearing or participated in negotiating the terms of the Release-Dismissal Agreement. Second, the district court noted

that, when Brian was questioned at the plea proceeding as to whether he was "satisfied with the legal representation that [he had] received[,]" he responded "Yes." *Id.* (citing R. 39-14, Plea Proceedings Tr., PageID #393.) We observe, however, that it is not obvious, from this question alone, which of his attorneys Brian may have been referring to. But more importantly, the fact that Brian answered this questioned in the affirmative is arguably only further evidence of his lack of sophistication. Brian contends that his stand-in counsel twice assured him that the Release-Dismissal Agreement could be expunged when Brian's no contest plea was expunged. A sophisticated criminal defendant—or, at least, a better advised criminal defendant—would have been aware that a release-dismissal agreement is a legally binding contract that cannot be "expunged" in the same way that one's criminal history may be expunged under certain conditions. The fact that Brian accepted and relied on this erroneous misinformation only further underscores his lack of sophistication. Third, the district court found that "there is nothing to indicate that he was represented by a public defender; therefore, since he chose his own counsel, presumably he would have sought new counsel if he truly were dissatisfied with counsel's representation and/or credentials." *Id.* Again, the question is not whether Brian expressed satisfaction with his counsel's representation; the question is whether Brian was sophisticated enough to know he should be dissatisfied with his counsel's representation.

The fourth *Rumery* factor asks whether the defendant had ample time to consider the agreement before signing it. This factor clearly cuts against Defendants-Appellees. Brian argued at summary judgment that, two days before his plea hearing, he told his attorney that he would not sign anything releasing any claims against the City or the officers involved. (*See* R. 51-15, Brian Decl., PageID #640(¶5).) Brian states, however, that 15 to 30 minutes before the hearing, he was told by stand-in counsel that he would "probably have to agree to an oral waiver

as part of [his] plea." (*Id.*)  Brian was allegedly also told that (1) the agreement would be oral rather than signed, and (2) it would only waive his right to bring an action against the defendants prior to expungement, which his counsel in fact filed on January 22, 2008.  (R. 51-24, Journal Entry, PageID #682.)  This amount of time, if true, is plainly insufficient.  *See Rumery*, 480 U.S. 394 (finding three days sufficient for an experienced businessman to consider whether to agree to a release-dismissal agreement with the assistance of an experienced criminal attorney); *Hill*, 12 F.3d at 578 (finding two months sufficient to consider whether to agree to release all civil claims in exchange for a dismissal of criminal charges of obstructing official justice, aggravated disorderly conduct, and resisting arrest);  *Kinney v. City of Cleveland*, 144 F. Supp. 2d 908, 916 (N.D. Ohio 2001) (finding Kinney's receipt of agreement at the courthouse on the day of hearing insufficient).

The district court did not specifically consider the question of timing in its analysis.  The district court did, however, find that Brian "offers no support" for his claim that he was told the waiver was only temporary and would be expunged when his conviction was expunged. *Patterson*, 2009 WL 2733522, at *4.  "No support," according to the district court's analysis, meant that Brian's declaration was insufficient:

> This declaration does not establish anything, especially in the face of his exchange with the state court judge during the plea proceeding.  Further, Brian has presented no affidavits from his criminal defense attorneys indicating that they ever told him that expungement of his record would also expunge any oral waiver he made on the record in open court.  His self-serving declaration alone is not enough to overcome the clear transcript of his plea proceeding and/or to create an issue of fact.

*Id.* *4 n.11.  The district court's analysis is erroneous for two reasons.  First, it is not Brian's burden at summary judgment, under the *Rumery* analysis, to prove the elements of voluntariness; it is clearly the Defendants-Appellees' burden.  *Rumery*, *480 U.S.* at 399 (O'Connor, J.,

concurring in part and concurring in the judgment); *Coughlen* 5 F.3d at 974. Second, there is no reason Brian should have known his declaration would be insufficient to overcome summary judgment, given that summary judgment proceedings were specifically bifurcated to first address the issue of qualified immunity. It is unclear from the record why the district court decided to address the defendants' waiver defense in the context of summary judgment, as opposed to at the motion to dismiss stage or at trial.

On appeal, Defendants-Appellees argue, without support, that Brian "was informed by his counsel of the terms of the agreement and the rights he was waiving." (Appellee's Br. at 10.) In fact, counsel's advice, as Brian understood it in the short amount of time he was given, caused him to believe that the release would only be temporary. Defendants-Appellees have presented no evidence refuting Brian's account of his stand-in counsel's advice.

The fifth *Rumery* factor, the nature of the criminal charges, also cuts against granting Defendants-Appellees summary judgment. Brian, a first time offender who had never even been arrested before, was told that the only options available to him were either to plead no contest to the misdemeanor of resisting arrest and waive all potential civil claims against the officers, or proceed to trial for both the misdemeanor charge and the felony charge of assaulting a police officer. While none of the parties has specified what penalty Brian was facing if he proceeded to trial on the felony charge, they have presented two starkly conflicting versions of the underlying facts of this case.

In Brian's account, he was arrested after a minor infraction; "yanked" into the street by the police without provocation; officers attempted to "body slam" him to the ground; he was then tased in the chest, again without provocation; and officers continued to tase and brutalize him even though he was handcuffed and on the ground. In the officers' collective account, Brian was

arrested for a minor infraction and for acting belligerently toward Sergeant Givens; pulled to the driver's side of Sergeant Givens' because an approaching crowd was interfering with Brian's arrest; and tased once in the chest after Brian broke away from Officer Evans and struck Officer Bickett in the head with his knee. On summary judgment, it is not for us to determine which of these accounts is more credible. *Anderson*, 477 U.S. at 255. It is sufficient to note that Brian's account, if true, is surely the kind of Hobson's choice that the *Rumery* Court was concerned with. *Rumery*, 480 U.S. at 400 ("The risk and expense of a criminal trial can easily intimidate even an innocent person whose civil and constitutional rights have been violated. . . . The coercive power of criminal process may be twisted to serve the end of suppressing complaints against official abuse, to the detriment not only of the victim of such abuse, but also of society as a whole.") (citation omitted).

Finally, the sixth *Rumery* factor considers whether the agreement was formed under judicial supervision. The district court repeatedly cited Brian's answers to the trial judge's questions during his plea colloquy as evidence of voluntariness. *See e.g., Patterson*, at \*4. Defendants-Appellees, relying on *Burke v. Johnson*, emphasize that "[t]his Court has upheld the validity and enforceability of release-dismissal agreements made in open court on the record." (Appellee Br. at 9) (citing *Burke*, 167 F.3d at 284-85). On the facts of this case, however, it is not obvious that the formation of this particular agreement in open court, under judicial supervision, supports its enforcement.[10] For instance, it is not necessarily true, given the nature

---

[10]The central issue in *Burke* was what standard of proof a defendant had to satisfy in establishing the voluntariness of a release-dismissal agreement. In *Rumery*, the plurality opinion authored by Justice Powell suggested that a clear and convincing evidence standard applied. 480 U.S at 398 (stating that it was "clear" that Rumery entered into the agreement "voluntarily."). Justice O'Connor, however, suggested that a preponderance of the evidence standard applied. *Id.* at 403 (describing the evidence that Rumery entered into the agreement voluntarily as "convincing.") In *Livingstone v. N. Belle Vernon Borough*, the Third Circuit adopted a clear and convincing

of state court plea proceedings, that the judge presiding over Brian's hearing was any more advised of the charges against him (or the underlying events) than any judge normally would be at that stage in the criminal proceedings. *See e.g.*, *Livingstone v. N. Belle Vernon Borough*, 12 F.3d 1205, 1213 (3d Cir. 1993) (en banc) ("*Livingstone I*") (finding a "patent ambiguity as to the existence of informed consent" "notwithstanding the presence of a judge" during the defendants' plea colloquy).

In sum, we find that there are genuine issues of material fact surrounding at least five of the six *Rumery* factors. Accordingly, the district court erred in finding, as a matter of law, that Brian's assent to the Release-Dismissal Agreement was voluntary, and therefore in granting summary judgment in favor of Defendants-Appellees.

---

evidence standard for evaluating oral release-dismissal agreements, and declined to determine what standard applied to written release-dismissal agreements. 91 F.3d 515, 534-36 (3d Cir. 1996) ("*Livingstone II*"). In *Burke*, this Court declined to adopt the Third Circuit's clear and convincing evidence standard, finding that: (1) "reading the release/dismissal agreement into the record in the context of a plea hearing[,] as was done in [that] case, should be viewed as the equivalent of a written agreement since judicial supervision provides due process protection against prosecutorial overreaching and insures voluntariness under all but the most unusual circumstances"; (2) *Burke* "is clearly distinguishable from *Livingstone*, and therefore, the Third Circuit's ruling should be limited to the facts of that particular case"; and (3) a preponderance of the evidence standard applies in determining the voluntariness of a criminal defendant's waiver of his constitutional rights. 167 F.3d 276, 284-85 (6th Cir. 1999); *accord Gonzalez v. Kokot*, 314 F.3d 311, 319 (7th Cir. 2002) (agreeing with the Sixth Circuit approach). The *Burke* panel upheld the validity of a release-dismissal agreement made in open court in part because it discerned no substantive difference between a written release and an oral release formed under judicial supervision in the context of a plea hearing. Thus, *Burke* holds, judicial supervision serves to elevate an oral agreement to the "equivalent of a written agreement." 167 F.3d at 284. *Burke*, however, provides little guidance as to what form and degree judicial supervision must take in order for the preponderance of the evidence standard to be satisfied. Further, the *Burke* panel emphasized that there was "nothing of record which suggests that Burke did not understand the terms of the release read or that he did not intend to agree to waive his right to sue the Defendants. All of the record evidence points to the fact that Burke voluntarily and knowingly and with the advice of counsel entered into the release/dismissal agreement." *Id.* at 284. The same cannot be said here.

2. *Prosecutorial Misconduct or Overreaching*

Under the second prong of the *Rumery* analysis, we consider whether "the prosecutor had an independent, legitimate reason to make this [release-dismissal] agreement directly related to his prosecutorial responsibilities." 480 U.S. at 398. The existence of prosecutorial misconduct or overreach is determined by the court as a matter of law. *See Hill*, 12 F.3d 575, 578-79; *see also Livingstone I*, 12 F.3d at 1215. "Such a legitimate reason ensures that the prosecutor acts consistent with his duties to uniformly enforce the criminal law, rather than as the agent for the private interests of potential § 1983 defendants." *Gonzalez*, 314 F.3d at 319.

*Rumery* requires that, in order for a court to find lack of prosecutorial misconduct, the party invoking a release-dismissal agreement as a defense must present evidence of a legitimate criminal justice reason for conditioning the plea agreement on a release. For instance, the *Rumery* majority repeatedly emphasized that, in that case, the prosecutor's purpose in fashioning the condition was to spare an alleged rape victim the trauma of testifying at either or both of Rumery's civil and criminal trials. *See Rumery*, 480 U.S. at 390, 398; *see also id.* at 402-03 (O'Connor, J., concurring in part and concurring in the judgment). Moreover, the majority repeatedly emphasized that there had been extensive testimony, from both the prosecutor and the defense attorney, that protection of the alleged rape victim "was a significant consideration in the prosecutor's decision." *Id.* at 398; *see also id.* at 390, 402-03 (O'Connor, J., concurring in part and concurring in the judgment).

In this case, the district court erred in its analysis of the prosecutorial misconduct prong. The district court found, without elaboration, that "Brian also fails to show (and does not even argue) that there was any prosecutorial misconduct involved in obtaining his waiver or that it would not be in the public interest to uphold the waiver." *Patterson*, 2009 WL 2733522, at *5.

This statement improperly shifts Defendants-Appellee's burden onto Brian. At summary judgment, it is the Defendants-Appellees' burden to prove the absence of prosecutorial misconduct. *Rumery*, *480 U.S.* at 399 (O'Connor, J., concurring in part and concurring in the judgment); *Coughlen* 5 F.3d at 974. They have failed to do so. Before the district court, Defendants-Appellees also erroneously placed the burden of proving misconduct on Brian, (R. 39, Defs.' Mot. Summ. J., PageID #234), and repeat this error on appeal. (Appellee Br. at 11-12.)

The record is devoid of evidence of a prosecutorial justification for conditioning Brian's plea agreement, but not Derek's, on the release of civil claims. Defendants-Appellees have offered no evidence, such as an affidavit or testimony from the prosecutor in Brian's case, as to why a release was desired. *See Hill*, 12 F.3d at 579 (finding, in light of the prosecutor's affidavit asserting that he did not know of arrestee's potential civil rights claim until after criminal charges were drafted and the absence of evidence suggesting that circumstances surrounding arrest and threatened prosecution were suspicious, there was no evidence of prosecutorial overreaching apart from release-dismissal agreement itself); *Gonzalez*, 314 F.3d at 320 (finding no prosecutorial misconduct where prosecutor testified at his deposition that he entered into a release-dismissal agreement to avoid a costly and lengthy trial over minor criminal charges). Rather, Defendants-Appellees essentially ask this Court to presume that no prosecutorial misconduct or overreaching occurred because the state court judge "did not express any concern (or even inquire) about prosecutorial abuse or overreaching." (Appellee's Br. at 11.) Defendant-Appellees' overreliance on the plea hearing transcript, standing alone, to prove the absence of prosecutorial misconduct fails for the same reason that their reliance on the transcript to prove voluntariness fails. Courts do not participate in the negotiation of plea agreements. As such, a

court cannot discern—solely from its supervision of the entry of a plea—whether prosecutorial misconduct or overreach contributed to the formation of an agreement. There is, therefore, simply no reason why the trial court would have inquired into the prosecutor's conduct during Brian's plea colloquy.

Brian, meanwhile, argues that the prosecutor made the decision to condition Brian's plea agreement on the release of civil claims because the prosecutor recognized Brian had a meritorious civil action because, in his account of events, he had not assaulted Officer Bickett and had himself been tased and assaulted by officers while he was handcuffed. (Appellant's Br. at 22-23; Appellee's Reply at 11-12.); *see also Coughlen*, 5 F.3d at 974. In the absence of any proof to the contrary from the Defendants-Appellees, the district court erred in dismissing Brian's argument.

### 3. *Public Interest*

The public interest prong of the *Rumery* analysis is linked to the prosecutorial misconduct prong. A majority of the *Rumery* Court suggested that the public interest prong can be satisfied "if the prosecutor demonstrates that obtaining the release was motivated by an independent, legitimate criminal justice objective." *Coughlen*, 5 F.3d at 975 (citing *Rumery*, 480 U.S. at 398). It therefore stands to reason that if the proponent of a release-dismissal agreement has failed to meet their burden of demonstrating a lack of prosecutorial misconduct or overreach, they have also failed to satisfy their burden of demonstrating that the public interest is served by enforcement of the agreement.

We have no doubt that significant public interests can be furthered by such agreements. "In many cases a defendant's choice to enter into a release-dismissal agreement will reflect a highly rational judgment that the certain benefits of escaping criminal prosecution exceed the

speculative benefits of prevailing in a civil action." *Rumery*, 480 U.S. at 393. Likewise, prosecutors also have an interest in entering these agreements because it saves municipalities the time and expense of defending against potentially meritless civil rights claims. *Id.* at 395-96 ("The vindication of constitutional rights and the exposure of official misconduct are not the only concerns implicated by § 1983 suits. . . . This diversion of officials from their normal duties and the inevitable expense of defending even unjust claims is distinctly not in the public interest. To the extent release-dismissal agreements protect public officials from the burdens of defending such unjust claims, they further this important public interest.") (plurality); *see also id.* at 399 ("Certainly some § 1983 litigation is meritless, and the inconvenience and distraction of public officials caused by such suits is not inconsiderable. Moreover, particular release-dismissal agreements may serve bona fide criminal justice goals.") (O'Connor, J., concurring in part and concurring the judgment).

Here, however, we have no record evidence from either the prosecutor or Brian's defense attorney regarding the prosecutor's reasons for desiring a release-dismissal agreement. Nonetheless, Defendants-Appellees argue that "[g]iven the substantial number of witnesses, and time and cost involved to secure a conviction, the public interest [was] better served [by] allocating criminal justice resources to other serious felony prosecutions." (Appellee's Br. at 12.) This argument is unsupported, speculative, and belied by the history of this case. If the prosecutor were truly concerned about conserving resources and warding off civil claims related to these events, then Derek's plea agreement would also have been conditioned on the release of civil claims against the officers and against the City. As things currently stand, this case was filed almost seven years ago. It has been nearly six years since Brian was dismissed as a plaintiff. This is the second appeal. The parties involved are now nearly nine years removed

from the events in question. Given the hours exhausted and expense incurred thus far, it is difficult to discern what possible benefit the Defendants-Appellees have gained from requiring a release-dismissal agreement from Brian, but not requiring a similar agreement from Derek. *See Livingstone I*, 12 F.3d at 1215 ("[A] general belief by prosecutors that release-dismissal agreements serve valid purposes is not sufficient to satisfy the public interest prong of the *Rumery* test."); *Cain v. Darby Borough*, 7 F.3d 377, 383 (3d Cir. 1993) ("[U]nder *Rumery* there must first be a case-specific showing that the released civil rights claims appeared to be marginal or frivolous at the time the agreement was made and that the prosecutor was in fact motivated by this reason.") Given the sharply conflicting accounts of this incident, exposure of the officers and the City to civil claims was reasonably foreseeable at the time of both Derek's plea deal and Brian's Release-Dismissal Agreement.

Accordingly, the district court erred in placing the burden on Brian as to the public interest factor, and the lack of evidence on this point necessitates reversal.

III.

We next address the district court's determination that Officer Bickett's Taser Report was inadmissible at trial. We review a district court's evidentiary rulings under the abuse of discretion standard. *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007). It is an abuse of discretion when the district court relies on clearly erroneous findings of fact, improperly applies the law, or applies an erroneous legal standard. *United States v. Lopez-Medina*, 461 F.3d 724, 741 (6th Cir. 2006). We reverse only where the district court's erroneous admission of evidence affects a substantial right of the party. Fed. R. Evid. 103(a); *see also United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006).

The City of Akron provided Officer Bickett's Taser Report to Derek in the course of discovery. (R. 59-9, Taser Report, PageID #880.) The document shows the date, time (GMT and local), and duration of each taser shot administered by the taser assigned to Officer Bickett. (*Id.* PageID #881-92.) The report covers a two-year period, from June 2004 to June 2006. The report was downloaded on June 12, 2008, from Taser International, the company that manufactures and distributes the tasers used by the Akron Police Department, by Akron Police Sergeant Michael Yohe, a Taser instructor. Sergeant Yohe provided the report to Defendant-Appellee Lieutenant Melissa Schnee, who later produced it in the course of discovery. Lieutenant Schnee used the Taser Report as part of her investigation into the officers' use of force on May 27-28, 2006. At trial, the district court excluded the Taser Report for lack of foundation, Fed. R. Evid. 602, and failure to authenticate, Fed. R. Evid. 901.

Plaintiff's counsel extensively questioned Officer Bickett at trial regarding the Taser Report. (R.141, Trial. Tr. Vol. 4, PageID #2233-2261; 2275-2285.) Officer Bickett testified that he was aware of the existence of the Taser Report because his attorneys had shown it to him. (*Id.* PageID #2243, 2254.) Officer Bickett further testified that he does not know where "taser downloads" are stored; does not know what is done with the downloads; that he is personally unable to download the Taser Report; and that he lacks knowledge of when or why a taser download is performed. (*Id.* PageID# 2241, 2244-45, 2250-52.) When Plaintiff's counsel asked Officer Bickett whether he was "aware from seeing the report that it shows five deployments of the taser" on May 27, 2006, defense counsel objected on the grounds of lack of foundation.[11] (R.141, Trial. Tr. Vol. 4, PageID #2255.) During a lengthy discussion at sidebar, the district court agreed that Plaintiff's counsel had not established a foundation, and that Officer Bickett

_____

[11]Defense counsel objected on the same grounds earlier in Officer Bickett's testimony. (R.141, Trial. Tr. Vol. 4, PageID #2233, 2234, 2235, 2248.)

"hasn't indicated that this is a report kept in the ordinary course of business"—as Plaintiff's counsel had been trying to establish. (*Id.* PageID #2255-57.) Defense counsel repeatedly conceded that the report was authentic, but did not concede or stipulate to its admissibility and argued that Plaintiff's counsel had not deposed Sergeant Yohe. (*Id.* PageID #2257-58.) The district court held, "The problem is no one is here to authenticate it. Although you're indicating it is authentic, . . . no one is here to establish foundation for what this means." (*Id.* PageID #2259.) Defense counsel argued that the report was hearsay "offered to prove the truth of the matter[,] which is that [Officer Bickett] pulled his trigger five times." (*Id.*) Plaintiff's counsel first disagreed that the report was hearsay, but then argued that the report fell into either the ordinary course of business or public records exceptions to the hearsay rule, with which defense counsel disagreed. (*Id.* PageID #2259-60.) The district court concluded that the report could not be introduced for lack of foundation. (*Id.* PageID #2261.)

Following a lunch break, Plaintiff's counsel asked the district court to reconsider admitting the report under the public records exception. (*Id.* PageID #2287); *see also* Fed. R. Evid. 803(8)(a)(3) ("The following [is] not excluded by the rule against hearsay . . . [a] record or statement of a public office if . . . it sets out . . . in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.") There again followed a lengthy discussion between counsel and the court. The court ultimately ruled:

> THE COURT: I think the factual findings—and that's what I was referring to earlier in the sidebar—factual findings from a legally authorized investigation would be the factual findings of, for instance, Lieutenant Schnee, which, as I alluded to earlier, those would be her findings.
> These aren't actual findings of an investigation.

(*Id.* PageID #2287.)

> THE COURT: No one has authenticated or has provided a foundation for the Court to understand or for anyone, the fact finder to understand more importantly, what this report means.
>
> How it's compiled. How accurate it is. Do you need to calibrate anything? I don't know the answers to any of that because you haven't provided any of that through any witness.
>
> . . . . You've brought no one to this Court to establish a foundation for the reading and understanding and proper interpretation of these reports. It's just analogous to, it seems, to any sort of report that's generated like this where you need actually someone to interpret—who is qualified to interpret the report.
>
> I mean, we can all read the numbers on here. And we can all read the names. But that doesn't mean we understand the report. And that's the link that's missing.

(*Id.* PageID #2289-94.)

## A.

We first address the Defendants-Appellees' assertion that the Taser Report is hearsay.[12] It is not. *See* Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement"). The report is neither a statement nor is it made by a declarant. *See* Fed. R. Evid. 801(a) ("'Statement' means a *person's* oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.") (emphasis added); Fed. R. Evid. 801(b) ("'Declarant" means the *person* who made the statement.") (emphasis added). It is merely a report of raw data produced by a machine. *See* 4 Federal Evidence § 8:13 (4th ed.) ("On a mechanical level, the question whether the hearsay doctrine reaches information

---

[12]It is not clear, from the trial transcript, that the district court adopted the defense's hearsay argument or excluded the Taser Report on that ground  The district court sustained the defense's objection due to lack of foundation, failure to authenticate, and, more generally, doubt as to whether the Taser Report is understandable without a foundational witness.

provided by machines . . . is easily answered. Under Rule 801(a), a statement is 'a person's' utterance, so nothing 'said' by a machine . . . is hearsay[.]"). Indeed, numerous circuit courts have held that statements made by machines are not hearsay. *See United States v. Lizarraga-Tirado*, --- F. 3d ----, No. 13-10530, 2015 WL 3772772, at *3 (9th Cir. June 18, 2015); *United States v. Lamons*, 532 F.3d 1251, 1263 (11th Cir. 2008); *United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008); *United States v. Washington*, 498 F.3d 225, 230 (4th Cir. 2007); *United States v. Hamilton*, 413 F.3d 1138, 1142 (10th Cir. 2005); *United States v. Khorozian*, 333 F.3d 498, 506 (3d Cir. 2003); *see also Mathews v. Broce*, No. 5:11-CV-133 MTT, 2012 WL 3527073, at *6 (M.D. Ga. Aug. 15, 2012) (admitting, over plaintiff's hearsay objection, a taser report showing that the plaintiff was "tased once in probe mode and once in drive stun mode," and noting that "no human intervened in the creation of the data") (citing, *inter alia*, *Lamons*, 532 F.3d at 1263-64). Accordingly, we need not delve into whether the Taser Report satisfies an exception to the rule against hearsay. *See* Fed. R. Evid. 802; Fed. R. Evid. 803.

B.

Although we find the Taser Report is not hearsay, that is not to say the report does not present evidentiary questions. *See, e.g., Lizarraga-Tirado*, 2015 WL 3772772, at *3. We therefore turn next to the question of foundation and authenticity. Laying a foundation for a particular piece of evidence often means "authenticating" that evidence. Authenticity is established by "evidence sufficient to support a finding that the item is what its proponent claims it is." Fed. R. Evid. 901(a); *see also Lizarraga-Tirado*, 2015 WL 3772772, at *3 (noting that the proponent of a machine statement "must show that a machine is reliable and correctly calibrated, and that the data put into the machine . . . is accurate"). Here, the district court found that the Taser Report lacked foundation because Officer Bickett had not generated the report, did not

know how they are made, and did not know how to download them. (R.141, Trial. Tr. Vol. 4, PageID #2256.) Further, the district court found that Officer Bickett had "not indicated . . . whether he even understands these reports or has an understanding of what was input to get this report or not input." (*Id.* PageID #2257.)

We disagree that this was sufficient grounds for excluding the Taser Report. Derek obtained the Taser Report from Defendants-Appellees in the course of discovery. Accordingly, the report is not something Derek generated himself or had generated for him. More importantly, Defendants-Appellees stipulated to the authenticity of the Taser Report, even if they did not concede its admissibility. (R.141, Trial. Tr. Vol. 4, PageID #2258.) Nothing more is required to establish authenticity. *United States v. Griffith*, 12 F.3d 215, at *2 (6th Cir. 1993) (per curiam) ("The law in the Sixth Circuit on the effect of a stipulation of fact is clear: Stipulations voluntarily entered by the parties are binding, both on the district court and on the appeals court.") (citations and quotation marks omitted); *cf. Lizarraga-Tirado*, 2015 WL 3772772, at *3 ("But defendant didn't raise an authentication objection at trial, nor does he raise one on appeal. He raised only a hearsay objection, and that objection was properly overruled."); *Washington*, 498 F.3d at 230.

Accordingly, the district court erred in finding the Taser Report was not authenticated.

C.

Having found that the district court erred in excluding the Taser Report, we must next determine whether that error was harmless. Reversible error occurs only where the district court's erroneous exclusion of evidence affects a substantial right of the party—*i.e.*, if it affected the outcome of the trial. Fed. R. Evid. 103(a); *see also United States v. Morales*, 687 F.3d 697, 702 (6th Cir. 2012). Here, although the district court used the terms "foundation" and

"authentication," the district court's concerns appear to have been more prosaic: is the report, on its own, understandable to laymen? Stated differently, does interpretation of the report require a witness with greater personal knowledge of such reports than Officer Bickett? In addition to questioning Officer Bickett about the report, did Plaintiff's counsel also need to call Lieutenant Schnee to testify about her use of the Taser Report during the use of force investigation? Would her testimony have been sufficient, or did Plaintiff's counsel also need to call Sergeant Yohe?

The district court suggested that the Taser Report is "like a radiology report" that "requires someone who understands these kinds of reports to interpret them." (R.141, Trial. Tr. Vol. 4, PageID #2290.) This analogy is not entirely suitable. A radiology report clearly requires interpretation by someone with expertise or specialization in reading images on film to diagnosis illness. This report, by comparison, is a fairly straightforward table. It is true that not every table can be read and understood by laymen, but some can. The relevant information, for purposes of this case, however, is contained in the highlighted columns:

| Seq. | GMT Time | | Local Time | | Duration | Temp | Battery |
|------|----------|--|------------|--|----------|------|---------|
| 0299 | 05/28/06 | 06:25:27 | 05/28/06 | 02:25:27 [a.m.] | 6 | 32 | 69 |
| 0300 | 05/28/06 | 06:25:33 | 05/28/06 | 02:25:33 [a.m.] | 5 | 33 | 69 |
| 0301 | 05/28/06 | 06:25:42 | 05/28/06 | 02:25:42 [a.m.] | 9 | 34 | 69 |
| 0302 | 05/28/06 | 06:25:48 | 05/28/06 | 02:25:48 [a.m.] | 5 | 34 | 68 |
| 0303 | 05/28/06 | 06:25:51 | 05/28/06 | 02:25:51 [a.m.] | 4 | 34 | 68 |

Plaintiff's counsel was trying to draw testimony from Officer Bickett that his taser registered five trigger pulls in the early morning hours of May 28, 2006, when these events took place. Any simple reading of these columns suggests that at 2:25 am, within the course of about 24 seconds, Officer Bickett pulled the trigger of his taser five times in succession. Thus, the

Taser Report tends to corroborate Derek's version of events: that he was tased five times by Officer Bickett, in addition to the tases he received from Officer Didyk.

Defendants-Appellees assert that, if the district court erred in its evidentiary ruling, then the error was harmless because the Taser Report corroborates Officer Bickett's testimony that he "sparked" his taser at the crowd 3-4 times, then tased Derek twice. (Appellee's Br. at 21-22.) The opposite is true. In actuality, the Taser Report impeaches Officer Bickett's testimony, because it shows that the five trigger pulls in question happened in succession over just 24 seconds. The report, therefore, does not support Officer Bickett's testimony of "sparking" the crowd and then, after an unspecified time lapse, tasing Derek. Exclusion of the Taser Report, therefore, does not constitute harmless error.

At trial, defense counsel raised myriad arguments questioning the reliability of the Taser Report.[13] These arguments present a double standard. On the one hand, Defendants-Appellees suggest the Taser Report was reliable enough for Lieutenant Schnee to have considered it during her use-of-force investigation. On the other hand, Defendants-Appellees argue that the exact same Taser Report is not reliable enough for the jury to consider it in determining whether Officer Bickett used excessive force on Derek. Defendants-Appellees cannot have it both ways. More importantly, Defendants-Appellee's arguments at most only go to the weight of the Taser Report—not to its admissibility.

---

[13]For instance, defense counsel argued that the duration of taser shots on the model taser used by Officer Bickett is calculated differently than the duration of taser shots a different model taser that he is personally familiar with from another case he litigated. (R. 141, Trial Tr. Vol. 4, PageID #2290-93.) Defense counsel's personal knowledge is not evidence. But even assuming this assertion is true, Plaintiff's counsel does not argue that the duration of each trigger pull is relevant. Rather, it is the sequence of the taser shots that is relevant to Derek's claim.

IV.

Based on the foregoing, we **REVERSE** the district court's grant of summary judgment to the officers on Brian Patterson's claims, and find the district court abused its discretion in excluding the Officer Bickett's Taser Report at Derek Patterson's trial. This matter is **REMANDED** for a new trial as to both Brian Patterson and Derek Patterson.

**KETHLEDGE, Circuit Judge, concurring in part and dissenting in part.** Although I agree with the majority that we should remand Derek Patterson's claims for a new trial, I think the district court properly granted summary judgment to the defendants on Brian's claims. Brian surely knew what he was doing when he released his claims. A conscientious state trial judge supervised the procedure by which Brian released them. And by agreeing to release them, Brian avoided the possibility of a felony conviction that would have forever changed his life for the worse. Indeed Brian would have been foolish not to have taken the deal. We should hold him to it.

I respectfully dissent from the remand in Brian's case.